## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLORADO

| | |
|---|---|
| NETCHOICE,<br><br>*Plaintiff,*<br><br>v.<br><br>PHILIP J. WEISER, in his official capacity as<br>Attorney General of Colorado,<br><br>*Defendant.* | Civil Action No. 1:25-cv-2538 |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

NetChoice brings this civil action against Defendant for declaratory and injunctive relief and alleges as follows:

### INTRODUCTION

1.      The First Amendment prohibits the government from compelling private actors to serve as a mouthpiece for the State. This prohibition is so clear that the Supreme Court has called it the one "fixed star in our constitutional constellation." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). But it is precisely this fixed star that Section 4 of Colorado House Bill 24-1136 (the "Act") seeks to displace. Section 4 of the Act compels social media websites to pro-vide repeated, burdensome, and state-mandated warning notifications to their minor users. *See* Ex. 1 (text of Act).[1] This law is designed to force "social media" websites to attempt to deter and discourage users from accessing the vast range of fully protected speech on those websites. Section 4 of the Act therefore violates bedrock principles of both the First Amendment and Due Process Clause, as well as precedent from across the nation.

---

[1] This lawsuit only challenges Section 4 of the Act (enacting § 6-1-1601). Unless otherwise noted, statutory citations in this Complaint refer to the Colorado Revised Statutes.

2.     The First Amendment's protection "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Generally, "the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). That is particularly true where, as here, the speaker from which a message is being compelled is engaged in expressive activity and "would prefer to remain silent" and "present [its expressive compilation] undiluted by" the government's preferred message. *Id.* (discussing *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 572-73 (1995)). Although "[r]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way . . . to stigmatize and shape behavior than for the government to have to convey its views itself, [] that makes [such a law] more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted). And these First Amendment principles "do[] not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024); *see NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) (invalidating compelled-speech requirement for websites); *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (similar).

3.     The websites that Colorado is attempting to deter minors from using allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought.'" *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (citation omitted).[2] In addition, these websites "engage[] in expression" by "display[ing]," "compil[ing,] and curat[ing]" fully protected, third-party speech. *Moody*, 603 U.S. at 716-17, 728.

---

[2] This Complaint refers to all "internet-based service[s], website[s], [and] application[s]," § 6-1-1601(4)(a), as "websites."

4.      That is why courts nationwide have enjoined enforcement of laws deterring or burdening minors' access to the fully protected speech on social media websites. *See NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

5.      Colorado's attempt to compel a content-based, speaker-based, and vague collection of "social media platforms" to discourage minors from using their services is equally unlawful. After all, "a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (citation omitted).

6.      In violation of the First Amendment, the Act would ostensibly force these services to publish repeated warning notifications to minor users containing one of two-state compelled messages. § 6-1-1601(1). Both options are designed to discourage minors from using the websites, and both unconstitutionally compel speech.

7.      Under § 6-1-1601(1)(a), covered websites can "provide users who are under the age of eighteen with information about their engagement in social media that helps the user understand the impact of social media on the developing brain, and the mental and physical health of youth users." § 6-1-1601(2). Moreover, the Act constrains the sources that covered websites can use to form their state-compelled opinions: "data from peer-reviewed scholarly articles or the sources included in the mental health and technology resource bank established" and maintained by the State itself. *Id.*

8.      Yet "the impact of social media" on young users is the subject of ongoing and vigorous debate, in addition to active litigation. Academics, policymakers, thought leaders, and parents all disagree on various issues regarding social media—from what websites qualify as "social media" to the precise balance of benefits and purported drawbacks they offer users.

9.      Or, under § 6-1-1601(1)(b), covered websites can "[d]isplay[] a pop-up or full screen notification" to a minor user who: "(I) Has spent one cumulative hour on the social media platform during a twenty-four-hour period; or (II) Is on a social media platform between the hours of ten p.m. and six a.m." § 6-1-1601(1)(b). This timing-based warning "must repeat at least every thirty minutes after the initial notification." § 6-1-1601(3).

10.     Compounding the Act's problems, its provisions are unconstitutionally vague. Section 4's warning notification requirement provisions are so vague that websites do not know precisely what a notification to minor users must contain to comply with the Act (beyond the vague requirements in § 6-1-1601(2)). And the central "[s]ocial media platform," coverage definition, § 6-6-1601(4), is full of vague terms that leave many websites across the internet uncertain about whether they must speak the Act's preferred message.

11.     For these reasons and more, this Court should enjoin Defendant from enforcing Section 4 of the Act against Plaintiff NetChoice's members and declare Section 4 of the Act unlawful.

## PARTIES & STANDING

12.     Plaintiff NetChoice is a District of Columbia nonprofit trade association for internet companies. NetChoice's mission is to make the Internet safe for free enterprise and free expression. NetChoice's members are listed at NetChoice, About Us, https://perma.cc/SDB4-DYYC.

13.     NetChoice has associational standing to challenge Section 4 of the Act because: (1) some of NetChoice's members have individual standing to sue in their own right;

(2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010).

14.    Multiple courts across the country have held that NetChoice has standing to seek redress for its members' injuries. *E.g.*, *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025); *Carr*, 2025 WL 1768621, at *4-7; *Uthmeier*, 2025 WL 1570007, at *6-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *Paxton*, 747 F. Supp. 3d at 1028-31; *Yost*, 778 F. Supp. 3d at 938-46; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *8-12 (W.D. Ark. Aug. 31, 2023).

15.    Based on the Act's definitions, § 6-6-1601(4), the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Automattic, which owns and operates Tumblr; (2) Meta, which owns and operates Facebook, Instagram, and Threads; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube. Although the Act does not regulate all of Plaintiff's members, this Complaint refers to members with services that the Act regulates as "members."

16.    Defendant Philip J. Weiser is the Colorado Attorney General. He is a Colorado resident and is sued in his official capacity. Defendant Weiser has authority to enforce the Act as a part of Colorado's consumer protection laws under § 6-1-2024.

## JURISDICTION & VENUE

17.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

18.    This Court has personal jurisdiction over Defendant because he resides in and/or conducts a substantial proportion of his official business in Colorado.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant re-
sides in, and the events giving rise to this civil action occurred in, Colorado.

## BACKGROUND

20.     **NetChoice members' covered websites disseminate, facilitate, and promote
speech fully protected by the First Amendment.** "[S]ocial media" websites such as NetChoice
members' covered services "engage[] in expression" through their "compil[ing] and curat[ing]"
and "display" of protected "third-party speech" (text, audio, images, and video) "created by oth-
ers." *Moody*, 603 U.S. at 716-17, 728.

21.     The vast array of speech on these websites includes expression at the heart of the
First Amendment's protections for art, literature, politics, religion, and "entertain[ment]." *Joseph
Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952); *see Packingham*, 582 U.S. at 105.

22.     NetChoice's covered members disseminate speech on their social media websites
to adult and minor users, who use these services to engage in a wide variety of speech fully pro-
tected by the First Amendment. On these websites, minors can "gain access to information and
communicate with one another about it on any subject that might come to mind." *Packingham*,
582 U.S. at 107; *see Yost*, 778 F. Supp. 3d at 932. For example, "[o]n Facebook, . . . users can
debate religion and politics with their friends and neighbors or share vacation photos." *Packing-
ham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on
them, learn about and advocate for causes they care about, showcase their art or athletic talent, and
hear from their local government officials. On Nextdoor, users can connect with neighbors, share
local news, and borrow tools. Pinterest allows its users to explore recipes, home decor, and more.
On Reddit, users have access to hundreds of thousands of communities, endless conversation, and
authentic human connection—with user-created and user-led communities on all manner of sub-
jects. Snapchat enables users to have digital conversations with friends and family in ways that

replicate real-life interactions. Threads provides a creative space where users can express their ideas in conversation with others, such as elected officials. Tumblr is a microblogging service that allows its users to discuss any topic, formatted to emphasize multimedia. On X, "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

23.     All of NetChoice's covered members' services allow their users to create accounts and communicate with other users through posts. § 6-6-1601(4)(a).

24.     **Resources about social media use provided by NetChoice members.** NetChoice members provide a variety of resources and information to help families make informed decisions about how to responsibly and safely use social media.

25.     For parents of minor users of Facebook and Instagram, Meta offers multiple resources through its Meta Family Center, including articles providing parents with information about screen time and how to help their teen balance time online and offline. Meta, Finding Balance Online (Mar. 2, 2022), https://perma.cc/49GY-YLPC ; Meta, Seeking Balance in the Physical and Digital Worlds (Mar. 12, 2024), https://perma.cc/S5Y4-RHVM. Meta also provides other digital wellness information for parents and teens, including "expert-backed advice on media usage by child age group" through Meta's "guide developed with the Digital Wellness Lab at Boston Children's Hospital." Meta, Parents, https://perma.cc/Q6DU-BYB7. Meta provides a link to this guide on its website, and the guide "includes actionable tips for common media-related health concerns, complemented by science-based context" on a variety of topics from sleep and mental health to cyberbullying. *Id.*; Boston Children's Hospital Digital Wellness Lab, Family Digital Wellness Guide, https://perma.cc/N7MM-SUUE.

26.     Nextdoor "has participated in a number of research studies that examine community connections across the globe" and provides access on its website to those research studies covering topics such as promoting online civility, inclusive moderation, and disrupting racial bias. Nextdoor, Research in the Neighborhood, https://perma.cc/F9MZ-QVSA.

27.     Pinterest's Help Center provides resources and information to parents about their teen's use of Pinterest and social media generally. Pinterest, Help Center: Resources for Parents and Caregivers of Teens, https://perma.cc/P2FX-75K9. Pinterest notes that "[t]hrough expert research, we've found that spending time on Pinterest improves young people's emotional wellbeing," and links to a study conducted with University of California Berkley on the power of inspirational content. *Id.* Likewise, Pinterest provides a link to #HalfTheStory, *id.*, which is a nonprofit whose "mission is to rebuild the next generation's relationship with technology, and it starts with unpacking the toll it takes on our mental health," Half The Story, About Us, https://perma.cc/PJD9-FBEK. Additionally, Pinterest is the founding signatory of the Inspired Internet Pledge, which "is a call to action for tech companies and the broader digital ecosystem to unite with the common goal of making the internet a safer and healthier place for everyone, especially young people." Pinterest, The Inspired Internet Pledge, An Industry-Wide Initiative to Create a Safer and Healthier Internet (June 20, 2023), https://perma.cc/2P3B-ERVK. Pinterest helped create the Inspired Internet Pledge in coordination with Boston Children's Digital Wellness Lab. *Id.*; Boston Children's Digital Wellness Lab, The Inspired Internet Pledge, https://perma.cc/N87Q-RL9W.

28.     Snap Inc. provides resources and toolkits for educators and parents, providing information about how teens use Snapchat and online wellbeing. Snap Inc., Educator Tools & Resources, https://perma.cc/72DE-SLFR; Snap Inc., Parents: Snapchat Tools and Resources, https://perma.cc/E2PZ-GV55. These resources include Snap Inc.'s "A Parent's Guide to Online

Safety," which was created through a partnership with Childnet, an online safety charity, to provide information to parents and teens about use of social media. Snapchat & Childnet, A Parent's Guide to Online Safety, https://perma.cc/BE9X-UFU7. (More generally, Childnet provides numerous guides, help, and advice for parents, teachers, and teens about social media and internet use. *See* Childnet, Home, https://perma.cc/GN2J-4CDQ.). Snapchat is also a signatory of the Inspired Internet Pledge. *See* Boston Children's Digital Wellness Lab, The Inspired Internet Pledge, https://perma.cc/NN8F-TBTV.

29.    YouTube provides "tools and resources" to parents of teens "to help" parents manage teens' "experience on YouTube" and answer questions "about their teen's behavior and well-being online." YouTube Help, Tips and Resources for Parents of Teens on YouTube, https://perma.cc/83FS-UAXM. These resources include YouTube's "Family Guide to Teen Content Creation" and various Family Guides on topics from safety to wellbeing. *Id.*

30.    **Covered websites' dedication to beneficial user experiences and user security.** NetChoice's members expend vast resources to improve their services and self-regulate the third-party speech disseminated on their websites to best ensure that it is appropriate for the community of users they seek to foster, especially minors. *See* NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://perma.cc/B3V6-B3JJ. They restrict the publication of harmful speech, such as violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. *See, e.g.*, *Moody*, 603 U.S. at 735 (discussing policies about "hate speech, violent or graphic content, child safety"). In addition, many covered websites promote positive and age-appropriate speech, such as content that encourages a healthy self-image.

31. **Existing options for parental control and oversight.** "[P]arents may rightly decide to regulate their child's use of social media—including restricting the amount of time they spend on it, the content they may access, or even those they chat with. And many tools exist to help parents with this endeavor." *Griffin II*, 2025 WL 978607, at *3 (collecting evidence); *e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 748 F. Supp. 3d at 1126 n.138.

32. There are resources that collect all of these parental tools in one place. *E.g.*, Internet Matters, Parental Control Guides, https://perma.cc/RN3U-ETA7.

33. Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the internet. *Griffin II*, 2025 WL 978607, at *3.

34. Cellular and broadband internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Family, https://perma.cc/XUP4-VYTH; AT&T, AT&T Secure Family, https://perma.cc/M6U7-NJAN; T-Mobile, Family Controls and Privacy, https://perma.cc/P4XC-M5BN; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/9JQ9-57NY.

35. Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/HQ3Y-L4JN. For example, some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/6C9V-HHEC; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/5PGC-459U. Parents can also use widely available third-party browser extensions to reinforce these tools. *E.g.*, Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://perma.cc/6GZG-P85C.

36.     Wireless routers often have settings allowing parents to block particular websites, filter content, monitor internet usage, and control time spent on the internet. *See, e.g.*, Netgear, Smart Parental Controls, https://perma.cc/6QKB-WD26; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/79KS-S7Z3.

37.     Device manufacturers allow parents to limit the time their children spend on the device, curtail the applications that can be used, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone or iPad, https://perma.cc/4QMC-HDEE; Apple, Use Screen Time on your iPhone or iPad, https://perma.cc/8G49-X966; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/D6WA-G77P; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/7P52-4UZF; Samsung, Manage Family Groups and Parental Controls with Your Samsung Account, https://perma.cc/G8N3-RZ5Q; Samsung, Use Digital Wellbeing features on your Galaxy phone or tablet, https://perma.cc/95SA-7J4W; Android Help, Manage how you spend time on your Android phone with Digital Wellbeing, https://perma.cc/Q9DE-KFG8.

38.     Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested By Our Editors*, CNN underscored (Jan. 2, 2025), https://perma.cc/3KKE-DVB2.

39.     **Parental tools provided by NetChoice members.** In addition, NetChoice members provide parents and minors with many tools and options to help ensure that minor children are responsibly using their services.

40.     Parents and guardians can use supervision tools on Facebook, Instagram, and Threads to set daily time limits for their teens or limit use during select days and hours; set reminders to close the apps; see the average amount of time their teen has spent on Facebook,

Instagram, and Threads over the last week and the total time spent on Facebook, Instagram, and Threads for each specific day over the last week; see who their teen follows and who follows their teen; see which accounts their teen is currently blocking; see when their teen reports someone and for what reason; approve or deny their teens' requests to change default safety and privacy settings to a less strict state; and see their teen's settings for account privacy, messaging, and sensitive content. *See, e.g.*, Instagram, Help Center, Parental Supervision, https://perma.cc/T5U4-PCTA; Facebook, Help Center, Safety Resources for Parents, https://perma.cc/SH4G-GWQR; Instagram, Help Center, Supervision on Threads, https://perma.cc/62UC-WAU5. Facebook, Instagram, and Threads also provide teens with tools to set their own time limits and set scheduled breaks. *See, e.g.*, Meta, Giving Teens and their Parents More Ways to Manage Their Time on Our Apps (June 27, 2023), https://perma.cc/U4V3-DFKV; Instagram, Help Center, Set Reminders to Take a Break on Threads, https://perma.cc/LM6R-59E5. Moreover, Meta has announced that minors under 18 will automatically be placed into Facebook and Instagram "Teen Accounts" which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. Via Teen Accounts, parents will have added supervision features, including ways to get insights into who their minors are chatting with and seeing topics their minor is looking at. Minors under 16 need a parent's permission to change any of these Teen Accounts settings to be less strict. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/YA7E-EWJR; Meta, We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger (April 8, 2025), https://perma.cc/2R7Y-A5KX.

41.    Pinterest is "running an experiment" on reminders during the school day that remind minor users that "open the Pinterest app during the school day" to "put down [their] phone[s], pause notifications, and focus on school." Pinterest, Help Center: Resources for Parents and Caregivers of Teens, https://perma.cc/6RXT-N8YG.

42.    Snapchat's "Family Center" allows parents to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report abuse. *See* Snapchat Support, What is Family Center, https://perma.cc/ZG4Z-FV9W.

43.    YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, My Family, https://perma.cc/2W86-38PH. YouTube also automatically turns on reminders for teens to "to take a break while browsing or watching videos or YouTube Shorts" and reminders for "when it's time for them to stop watching YouTube and go to bed." YouTube Help, Tips and Resources for Parents of Teens on YouTube, https://perma.cc/7FCT-C64V.

44.    All NetChoice members prohibit minors under 13 from accessing their main services (which are those regulated by the Act), although some offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://perma.cc/4MVD-TP8P; YouTube Help, What Is a Pre-Teen Supervised Experience on YouTube, https://perma.cc/2SWB-AGZ8. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

## COLORADO HOUSE BILL 24-1136

45.    Section 4 of Colorado House Bill 24-1136 forces a content-based, speaker-based, and vague collection of "social media platforms" to opine on the highly controversial purported effects of social media use on minors' mental and physical health, in the form of repeated and burdensome notifications to minor user.

46.    Section 4 is the relevant portion of the Act for purposes of this complaint. Section 4 requires covered websites to comply with its requirements on or before January 1, 2026.

47.    **Content-based, speaker-based, and vague central coverage definition of "social media platform." § 6-6-1601(4)(a).** The Act targets an identifiable set of disfavored internet websites under its "social media platform" coverage definition, which defines the scope of covered websites and excludes numerous others from its burdens based on their "subject matter" and thus their "content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563-64 (2011).

48.    The Act regulates "social media platform[s]," which the Act defines as any "internet-based service, website, or application that" meets four requirements:

> (I) Has more than one hundred thousand active users in Colorado;
>
> (II) Permits a person to become a registered user, establish an account, or create a public or semi-public profile for the purpose of allowing users to create, share, and view user-generated content through the account or profile;
>
> (III) Enables one or more users to create or post content that can be viewed by other users of the medium; and
>
> (IV) Includes a substantial function to allow users to interact socially with each other within the service or application. . . .

§ 6-1-1601(4)(a).

49.    Section 4's covered "actors" and "activities," *Moody*, 603 U.S. at 724, include the members and services identified above in ¶ 15.

14

50. The Act's use of "create" or "post" content accords with the ordinary meaning of those terms, which denotes pieces of expressive content submitted to online services for multiple people to see.

51. For example, a "post" is ordinarily defined as "an electronic message or information that is put on a website in order to allow many people to see it." Posting, Cambridge.org Dictionary, https://perma.cc/BV3L-GASU.

52. In other words, the Act singles out the "kinds" of "social media" websites discussed by the Supreme Court in *Moody* and *Packingham*—namely, websites that enable their users to view and engage in fully protected speech. *Moody* applied full First Amendment protection to websites that work in exactly this way: "allow[ing] users to upload content . . . to share with others" and allowing those "viewing the content . . . [to] react to it, comment on it, or share it themselves." 603 U.S. at 719.

53. The Act exempts a litany of entities and services from its compelled-speech requirements based on content and speaker. Websites with the following "predominant or exclusive function[s]" are exempted:

(I) Providing electronic mail;

(II) *Facilitating commercial transactions*, if the interaction with other users or account holders is generally limited to:

> (A) The *ability to upload a post and comment* on reviews or the ability to display lists or collections of goods for sale or wish lists; and

> (B) The *primary function of the platform is focused on online shopping or e-commerce* rather than interactions between users or account holders;

(III) Facilitating teleconferencing and video conferencing features that are limited to certain participants in the teleconference or video conference and are not posted publicly or for broad distribution to other users;

(IV) Facilitating crowd-sourced content for *reference guides such as encyclopedias and dictionaries*;

(V) Providing cloud-based electronic services, including cloud-based services that allow collaborative editing by invited users;

(VI) Consisting primarily of *news, sports, entertainment*, or other content that is prese-lected by the provider and not user generated, and any chat, comment, or interactive functionality that is provided incidental to, directly related to, or dependent upon provision of the content; or

(VII) *Interactive gaming, virtual gaming, or an online service that allows the creation and uploading of content for the purpose of interactive or virtual gaming*;

(VIII) Providing information concerning *businesses, products, or travel information*, including user reviews or rankings of businesses or products;

(IX) Facilitating communication within a business or an enterprise among employees or affiliates of the business or enterprise so long as access to the service or application is restricted to employees or affiliates of the business or enterprise;

(X) Selling enterprise software to businesses, governments, or nonprofit organizations;

(XI) Providing a *streaming service* that streams only licensed media in a continuous flow from the service, website, or application to the end user and does not require a user or account holder to obtain a license for the media by agreement with a social media platform's terms of service;

(XII) Providing an online service, website, or application that is used by or *under the direction of an educational entity*, including a learning management system, a student engagement program, or a subject- or skill-specific program, for which the majority of the content is created or posted by the provider of the online service, website, or application and the ability to chat, comment, or interact with other users is directly related to the provider's content;

(XIII) Providing or obtaining technical support for a platform, product, or service;

(XIV) Providing *career development opportunities*, including professional networking, job skills, learning certifications, and job posting and application services;

(XV) Focused on facilitating *academic or scholarly research*; or

(XVI) Reporting or disseminating *news information for a mass medium*, as defined in section 13-90-119.

§ 6-6-1601(4)(b) (emphases added).

54.     The Act excludes the "kinds of websites" beyond "social[ ]media" for which *Moody* questioned whether a different First Amendment editorial-discretion analysis might apply. *See* 603 U.S. at 718, 724-25 (discussing email, online marketplace, peer-to-peer payment, and ride-sharing services). The Act does this through both its definition of "social media platform" and its myriad exclusions.

55. The Act's exclusion of "electronic mail," § 6-6-1601(4)(b)(I), excludes "email," *Moody*, 603 U.S. at 725.

56. The Act's exclusion of "[o]nline shopping or ecommerce," § 6-6-1601(4)(b)(II)(B), excludes "online marketplace[s] like Etsy" and "payment service[s] like Venmo," *Moody*, 603 U.S. at 725.

57. The Act's exclusion of websites where the "content . . . is preselected by the provider and not user generated," § 6-6-1601(4)(b)(VI), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725.

58. Moreover, the Act does not apply to myriad other "kinds of," *id.* at 718, online services, such as: (1) teleconferencing and video conferencing; (2) reference guides; (3) interactive and virtual gaming; (4) cloud-based services; (5) information on businesses, products, or travel; (6) business communication; (7) enterprise software; (8) streaming services; (9) educational services; (10) technical support; (11) professional networking; (12) academic research; and (13) news information.

59. Nothing in the Act defines key coverage terms, such as "predominant or exclusive function" or "incidental to." § 6-6-1601(4)(b)(VI).

60. **Compelled-speech warning requirements. § 6-1-1601(1)-(3).** "On or after January 1, 2026, a social media platform must establish a function that" requires covered websites to provide either one of two state-mandated messages. § 6-1-1601(1).

61. First, under § 6-1-1601(1)(a), covered websites can "provide users who are under the age of eighteen with information about their engagement in social media that helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users." § 6-1-1601(2).

62.    Accordingly, § 6-1-1601(1)(a) compels covered websites to opine on the highly controversial topic of "the impact of social media" on the "mental and physical health" of minors, which is the subject of intense scholarly and social debate, as well as active litigation.

63.    Colorado limits the "information" that covered websites can use to form its state-compelled opinion: "The information must be supported by data from peer-reviewed scholarly articles or the sources included in the mental health and technology resource bank established" and maintained by the Colorado Department of Education, pursuant to Section 2 of the Act. § 6-1-1601(2).

64.    Section 2 of the Act requires the Colorado Department of Education to create, with the assistance of a "stakeholder group," and maintain a "resource bank" that is made up of "existing evidence-based, research-based scholarly articles and promising program materials and curricula pertaining to the mental and physical health impacts of social media use by youth, internet safety, and cybersecurity." § 22-2-127.8(1)(1).

65.    The Act also does not allow covered websites to freely make decisions about the content and form of the warnings they are required to provide either. The Act requires Colorado officials to "establish standards" for "notifications" that "meet[] the [Act's] requirements." § 6-1-1601(5)(a). The standards must: (a) "Recommend intervals for notification frequency"; (b) "Provide sample messaging for the content of the notification"; (c) "Be informed by data and research on the efficacy of notifications"; and (d) "Recommend the age range of users who would most benefit from notifications." § 6-1-1601(5). And, the Act additionally requires that any notification provided under § 6-1-1601(1)(a) be "informed by the[se] standards." § 6-1-1601(1)(a).

66.    Section 6-1-1601(1)(a)'s compelled-speech requirements put websites to an unconstitutional choice. On one hand, they can either make statements that they believe to be

18

truthful about the use of "social media" services—which may then become fodder for claims alleging misrepresentation. On the other hand, they can make statements they believe to be inaccurate about the purported harms of their services to avoid enforcement risk under the Act, which likewise could be used against the services in ongoing and prospective litigation. But the government cannot "manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). And regardless of what websites say, they face enforcement risk under the Act.

67.     Second, under § 6-1-1601(1)(b), covered websites can alternatively "[d]isplay[] a pop-up or full screen notification to a user who attests to being under the age of eighteen when the user: (I) Has spent one cumulative hour on the social media platform during a twenty-four-hour period; or (II) Is on a social media platform between the hours of ten p.m. and six a.m." § 6-1-1601(1)(b).

68.     This timing-based warning "must repeat at least every thirty minutes after the initial notification." § 6-1-1601(3).

69.     The Act is otherwise vague as to what content a covered website must include in the alternative timing-based warning notification under § 6-1-1601(1)(b).

70.     One possibility is that the alternative timing-based notification must provide the same information required by the first option: "information about [users'] engagement in social media that helps [them] understand the impact of social media on the developing brain, and the mental and physical health of users." § 6-1-1601(2). That is because the Act provides that: "The function established pursuant to subsection (1) of this section"—which includes the timing-based warning in § 6-1-1601(1)*(b)*—"must provide users [under 18] with information about their engagement." § 6-1-1601(2).

71.     But the Act also states that the first function established under (1)(a)—but *not* the timing-based notification under (1)(b)—must "be informed by the standards established in subsection (5)," § 6-1-1601(1)(a). So the alternative, timing-based notification may require the covered website to display *only* information about how long the user has been using the service or the time at which the user is using the service. *See* § 6-1-1601(b)(I)-(II); § 6-1-1601(3) ("If the social media platform establishes the function described in subsection (1)(b) of this section . . . .").

72.     **Enforcement and penalties. §§ 6-1-110, -112.** The Act amends Colorado's consumer protection laws, which are enforceable by the Colorado Attorney General. § 6-1-103.

73.     The Attorney General may pursue various remedies, including injunctions and civil penalties, to enforce Section 4 of the Act. *See, e.g.*, §§ 6-1-110, 6-1-112. The potential civil penalties for violation of the Act are substantial—up to $20,000 for "*each* violation." § 6-1-112(1)(a) (emphasis added). Every "consumer or transaction involved" triggers a new "violation." *Id.*

## CLAIMS

74.     Plaintiff raises both (1) a facial challenge to Section 4 of the Act; and (2) a challenge to Section 4 as applied to the NetChoice members and services identified in ¶ 15.

75.     For all First Amendment claims, the facial challenge standard asks whether "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). At a minimum, the Act is invalid to the extent it regulates "social media" websites, including as applied to Plaintiffs' members' covered services identified in ¶ 15. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff). In other words, the Act is unconstitutional to the extent that it compels speech from NetChoice's regulated members.

76.    The First Amendment facial-challenge inquiry here is straightforward "from the face of the law": All aspects of the Act's speech-compelling provisions, "in every application to a covered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp.*, 116 F.4th at 899 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)); *see Carr*, 2025 WL 1768621, at *8 ("[B]ecause the Act raises the same First Amendment issues in each application, the 'full range of [the Act's] applications' are those 'constitutionally impermissible' ones." (citation omitted)); *Uthmeier*, 2025 WL 1570007, at *15 ("The law by definition applies to websites that serve as forums for First Amendment speech, and imposes the same onerous restriction with re-spect to each." (citation omitted)); *Paxton*, 747 F. Supp. 3d at 1038 (the state law "raises the same First Amendment issues in every application to a covered business" (quoting *Bonta*, 113 F.4th at 1115-16 (internal quotation marks omitted))); *Reyes*, 748 F. Supp. 3d at 1121 n.92 (noting that First Amendment facial challenge "questions are easily answered" where "[t]here is no dispute about who and what the Act regulates" or "how the First Amendment applies to *different* websites or regulatory requirements" (internal citation omitted)). At the very least, Section 4's compelled speech requirements are unconstitutional to an extent that would substantially outweigh any con-stitutional applications.

77.    Similarly, "[t]o mount a facial vagueness challenge" to the Act, NetChoice need only show "that the potential chilling effect on protected expression is both real and substantial." *Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005) (citation omitted). Thus, facial "[v]agueness and overbreadth challenges are similar." *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988). Here, a facial vagueness challenge is proper because "there is no reason to believe one

social media company is better suited than another to understand [the Act's] vague terms." *CCIA*,

747 F. Supp. 3d at 1031.

### COUNT I
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
### (WARNING NOTIFICATION REQUIREMENT § 6-1-1601)

78.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

79.     As incorporated against the States by the Fourteenth Amendment, the First Amend-

ment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . .

abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. The First Amendment

protects "publish[ing]," *Reno*, 521 U.S. at 853; "disseminat[ing]," *303 Creative LLC*, 600 U.S. at

592; "curating," *Moody*, 603 U.S. at 731; and "creating, distributing, [and] consuming" protected

speech, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011). And those rights apply to

"social-media platforms." *Moody*, 603 U.S. at 719.

80.     The freedom of speech protected by the First Amendment "includes both the right

to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714; *see Moody*,

603 U.S. at 733.

81.     The "government may not compel a person to speak its own preferred messages."

*303 Creative*, 600 U.S. at 586.

82.     "[T]his general rule, that the speaker has the right to tailor the speech, applies not

only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker

would rather avoid." *Hurley*, 515 U.S. at 573; *see 303 Creative*, 600 U.S. at 586 (it does not "matter

whether the government seeks to compel a person to speak its message when he would prefer to

remain silent or to force an individual to include other ideas with his own speech that he would

prefer not to include").

83.    That is especially true here, where the Act's compelled-speech requirements would alter the "expressive product[s] that most reflects [covered websites'] views and priorities." *Moody*, 603 U.S. at 718.

84.    Section 4's compelled-speech warning requirements trigger and fail strict First Amendment scrutiny.

85.    **Section 4's compelled-speech requirements trigger strict scrutiny.** Section 4's compelled-speech warning notification requirements, § 6-1-1601, trigger strict scrutiny in multiple ways.

86.    *First*, compelled-speech requirements like Section 4's compelled warnings always trigger strict scrutiny.

87.    "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech" and thus always triggers strict scrutiny. *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citations omitted); *X Corp.*, 116 F.4th at 900.

88.    Content-based laws that regulate speech are "'presumptively unconstitutional and may be justified only if' they satisfy strict scrutiny." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2302 (2025) (quoting *Reed*, 576 U.S. at 163).

89.    Here, Section 4's warning notification requirements trigger strict scrutiny because they compel speech.

90.    Section 4 requires covered social media websites to publish notifications and information on their own websites designed to dissuade use of their services.

91.    *Second*, Section 4 triggers strict scrutiny because its speech regulation depends on the Act's content-based central "social media company" coverage definition.

92.     Section 4's content-based coverage definition is an independent reason to subject the Act's compelled-speech warning requirements to strict First Amendment scrutiny.

93.     Section 4's central coverage definition is content-based because it draws lines based on the subject of the speech on a particular website.

94.     For example, it distinguishes user-generated content from other kinds of content, including content "preselected by the provider and not user generated." § 6-1-1601(4)(b)(VI); *see* § 6-1-1601(4)(a)(II); *Paxton*, 747 F. Supp. 3d at 1038; *Griffin II*, 2025 WL 978607, at *9. It also distinguishes between websites that "include[ ] a substantial function to allow users to interact socially with each other" and websites that foster other types of interaction (*e.g.*, business, commercial, etc.). § 6-1-1601(4)(a)(IV); *see Reyes*, 748 F. Supp. 3d at 1122-23.

95.     Likewise, Section 4 *excludes* a host of websites based on the subject matter presented on the particular website, such as websites where the "predominant or exclusive function" is "streaming service[s]," "[n]ews, sports, entertainment," "[o]nline shopping," "[i]nteractive gaming, virtual gaming," "[c]areer development opportunities," and "academic or scholarly research." § 6-1-1601(b). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see Sorrell*, 564 U.S. at 564 (similar); *Carr*, 2025 WL 1768621, at *11; *Yost*, 778 F. Supp. 3d at 954; *Griffin II*, 2025 WL 978607, at *8-9; *Reyes*, 748 F. Supp. 3d at 1123.

96.     In addition, Section 4's reference to a website's "predominant or exclusive *function*" is a proxy for other content-based restrictions. § 6-1-1601(4)(b) (emphasis added). But governments cannot "swap[ ] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022). Section 4 violates this precept because it exempts internet websites that allow people

to "interact" regarding certain favored content (*e.g.*, sports or gaming) while restricting websites that allow people to "interact" regarding other content (*e.g.*, politics or religion). § 6-1-1601(4)(a)(IV), (b).

97.    At a minimum, Section 4 triggers heightened First Amendment scrutiny because its central coverage definition is also speaker-based. Section 4 discriminates based on who is disseminating speech—regulating covered websites but not others like those whose "predominant or exclusive function" is "[n]ews, sports, [or] entertainment."

98.    "[L]aws that single out the press, or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner*, 512 U.S. at 640-41 (cleaned up).

99.    Section 4's central coverage definition is speaker-based because it advantages websites that disseminate "content that is preselected" and "generated" by the website and "not" the user, § 6-1-1601(4)(b)(VI), while burdening similar websites that disseminate user-generated content, even if those websites also post or create their own content (as many websites do).

100.    Because Section 4's central coverage definition is both content-based and speaker-based, so too is each provision of the Act compelling speech that relies on this definition. *See Reyes*, 748 F. Supp. 3d at 1120 (finding "persuasive" the argument that "the entire Act facially violates the First Amendment because the Act's operative provisions each rely on the Central Coverage Definition" (citation omitted)).

101.    Section 4's warning notification requirements, § 6-1-1601(1)-(3), regulate and burden speech by compelling covered websites to repeatedly convey an opinion on a highly controversial topic based on a state-preferred subset of a developing body of research. These provisions rely on the Act's central "social media platform" definition.

102.    The Act does not compel commercial speech or information related to commercial speech and thus is not subject to intermediate First Amendment scrutiny.

103.    The Tenth Circuit relies on three factors when determining whether speech is commercial: (1) is it an advertisement, (2) does it refer to a specific product, or (3) is it motivated by an economic interest. *United States v. Wenger*, 427 F.3d 840, 847-48 (10th Cir. 2005) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)); *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1274 (10th Cir. 2000) (similar); *see also Bonta*, 113 F.4th at 1119 (Ninth Circuit applying similar factors).

104.    States cannot force companies to engage in commercial speech if companies would not otherwise engage in commercial speech.

105.    The Act's compelled-speech warning requirements do not require disclosures appended to commercial speech, such as the third-party commercial advertisements that the covered websites publish. Rather, the Act's compelled-speech requirements require covered platforms to engage in speech when they otherwise would not do so.

106.    The Act's compelled-speech warning requirements do not refer to specific products. In fact, the disclosures do not concern any particular website or service at all. Instead, they require warnings about the impact of social media *generally* (based solely on the state-selected resources), without reference to the alleged impact of the speaker's *own* services.

107.    The Act's compelled-speech warning requirements are not motivated by an economic interest.

108.    Even if the Act's compelled-speech warning requirements could be construed to touch on commercial speech, they are "inextricably intertwined" with otherwise fully protected speech, which is subject to strict scrutiny. *See Riley*, 487 U.S. at 796.

109.    Accordingly, the standard of scrutiny articulated in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), does not apply here.

110.    *Zauderer* review is limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010).

111.    The Act's compelled-speech requirements have nothing to do with "commercial speech," let alone "misleading" commercial speech. *Zauderer*, 471 U.S. at 644, 651.

112.    The Act's compelled-speech requirements do far more than simply mandate disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available." *NIFLA*, 585 U.S. at 768 (citation omitted); *see Zauderer*, 471 U.S. at 651.

113.    The compelled-speech warning requirements are highly controversial, because there is "robust disagreement by reputable scientific sources" and "scientific debate" on that issue—not to mention ongoing litigation. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022).

114.    The Act's warning notification requirement is not a neutral, purely factual statement that covered websites would agree with. Rather, it is a statement that is only triggered by what the state considers "too much" use of the website and based upon state-selected information about "the impact of social media on the developing brain and, and the mental and physical health of youth users." § 6-1-1601(2).

115.    In addition, the Act's compelled disclosures are designed to deter use of the website. *Nat'l Ass'n of Mfrs.*, 800 F.3d at 530 ("[R]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally

offensive, not less so." (citation omitted)); *Sorrell*, 564 U.S. at 576 (2011) ("[T]he fear that speech might persuade provides no lawful basis for quieting it."). That message of deterrence is "controversial" because it is "fundamentally at odds with" covered websites' missions to be open and available for users, including minor users, to access the wide range of protected speech available on their services. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277-78 (9th Cir. 2023) (citation omitted).

116.    The warning notifications are not factual and are controversial for another reason: the state of the literature on the impacts of social media is nascent and constantly changing. An issue is "controversial" where there is "robust disagreement by reputable scientific sources" and "scientific debate" on that issue. *See id.* (citation omitted). Indeed, even the Surgeon General's advisory cited in the Act, HB24-1136 § 1(a), noted that "robust" analysis of social media has "not yet been conducted" and that "[m]ore research is needed to fully understand the impact of social media," U.S. Surgeon General, Social Media and Youth Mental Health at 4, The U.S. Surgeon General's Advisory (2023), https://perma.cc/D2TM-KHRH. And that same advisory notes research showing the "benefits of social media use" for minors, including "positive community and connection with others who share identities, abilities, and interests," "access to important information," a "space for self-expression," and "[t]he ability to form and maintain friendships online and develop social connections." *Id.* at 6. Thus, the Act's requirement for covered websites to display warning notifications to users about "the impact of social media" based on existing literature is a controversial issue, still subject to significant debate with many open questions left to research.

117.    To the extent that the Act is construed to require that social media websites provide literally true factual information about what some studies say or about time spent on the service,

the compelled-speech warnings still imply that there is something wrong with social media use. *See Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1276-78.

118.    Even if the Act's compelled-speech requirements regulated commercial speech, these provisions would still violate the First Amendment because each provision imposes undue burdens, and none is reasonably related to preventing consumer deception. *NIFLA*, 585 U.S. at 776 ("[A] disclosure requirement cannot be 'unjustified or unduly burdensome'" (citation omitted)).

119.    In sum, the Act's warning notification requirements are non-commercial, content-based compelled speech subject to strict scrutiny. But at a minimum, if they are compelled commercial speech, *Zauderer* does not apply and the Act's requirements are subject to—and fail—intermediate scrutiny.

120.    **The Act's compelled-speech warning requirements fail strict scrutiny or any form of First Amendment scrutiny.** The Act cannot satisfy any form of heightened First Amendment scrutiny.

121.    Under strict scrutiny Defendant must demonstrate that Colorado has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted).

122.    The Act does not serve any compelling governmental interest.

123.    Colorado lacks a sufficient governmental interest in forcing covered websites to deter their minor users from accessing protected speech.

124.    Colorado lacks an interest in compelling covered websites to opine on highly controversial and ongoing debates about social media, especially when many private sources are already available to achieve the same ends.

125.    Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power" to dictate what "ideas" or statements private parties must provide to "children." *Brown*, 564 U.S. at 794 (citation omitted).

126.    Regardless of the level of First Amendment scrutiny that applies, the Act's compelled-speech requirements are "unduly burdensome." *NIFLA*, 585 U.S. at 778. Both of the Act's compelled-speech options threaten to "drown[] out" the speech that covered websites otherwise present to users. *Id.*; *see Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019) ("the contrasting rectangular border containing a warning that covers 20% of the advertisement [would] drown out Plaintiffs' messages" (cleaned up)).

127.    Section 6-1-1601(1)(a) requires websites to display potentially voluminous messages opining on highly controversial and complicated research—and then to repeat that information at some kind of regular "interval[]." § 6-1-1601(1)(a), (5)(a). And Section 6-1-1601(1)(b) requires a "pop-up" or "full screen notification" every thirty minutes. Both of these options would substantially interfere with covered websites' dissemination of "curate[d] . . . feeds" that "combin[e] 'multifarious voices' to create a distinctive expressive offering." *Moody*, 603 U.S. at 711 (citation omitted).

128.    In any event, under the First Amendment, Defendant has the burden to "specifically identify" how the Act addresses an "actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* Here, Defendant must demonstrate that there is a problem in need of compelled speech, and that compelled speech is the solution with the least possible restrictive effect on speech.

129.    Defendant cannot carry either burden.

130.    To start, the Act's compelled-speech requirements are not the least restrictive means that the State could have used to address concerns about minors' use of social media.

131.    Rather than compelling covered websites to display warning notifications, the Colorado government could have provided more information and education to parents about the same information. In fact, Section 2 of the Act does just that.

132.    Colorado could go a step further and require schools and other government entities to provide digital literacy instruction to K-12 students about technology and social media use. *See, e.g.*, ExcelinEd, State Approaches to Digital Literacy Instruction (Feb. 2024), https://perma.cc/KS5S-BUVR.

133.    Similarly, the State could also encourage the use of parental tools for overseeing their minor children's online activity. *See Bonta*, 113 F.4th at 1121 ("The State could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers; [or] (2) educating children and parents on the importance of using such tools."); *see also Reyes*, 748 F. Supp. 3d at 1127 ("Defendants have not shown the Act is the least restrictive option for the State to accomplish its goals because they have not shown existing parental controls are an inadequate alternative to the Act."). "To the extent that parents are not aware of" this information or "these tools, notice to parents of their availability is a much less restrictive means of promoting the State's interest." *Griffin II*, 2025 WL 978607, at *14.

134.    Parents have a wealth of choices to help oversee their minor children online. *See* Internet Matters, Parental Control Guides, https://perma.cc/6R8Y-YZHU. The Supreme Court has repeatedly endorsed similar parental controls over governmental intervention. *See, e.g.*, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

135.    Many covered websites also include easily accessible information about safe and rewarding use of social media for users on their services and provide options for parents and their children to ensure that minors are safely and responsibly using their services. *See, e.g.*, *supra* ¶¶ 39-43. The Supreme Court has endorsed similar "voluntary" efforts over governmental mandates. *Brown*, 564 U.S. at 803.

136.    More generally, private sources are better positioned than covered websites to provide minor users with information about social media across multiple types of services. *See, e.g.*, Boston Children's Hospital, Boston Children's Digital Wellness Lab, https://perma.cc/96BR-T5CL.

137.    Although the Act contains legislative findings about the purported negative impacts of social media use on minors, those findings do not explain how or why compelling covered websites to publish warning notifications will prevent or mitigate any of those impacts, nor how they will do so in a way that is more effective than private solutions.

138.    Moreover, "the Act is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Yost*, 778 F. Supp. 3d at 957.

139.    The Act is overinclusive because it requires warning notifications for large swaths of valuable, protected, and entirely innocuous speech, without purporting to identify websites that are harmful to minors or even likely to be accessed by minors. For example, it would require warning notifications for a 17-year-old watching educational lectures on YouTube for more than an hour, or a 16-year-old logging into Facebook to mark herself safe from a natural disaster at 10:30 p.m.

140.    The Act is also overinclusive in that it requires warning notifications based on peer-reviewed literature or the State's resource bank for *all* covered websites. There is not

sufficient literature addressing all of the websites covered by the Act. Websites like Nextdoor and Pinterest will be compelled to provide information based on studies about other services, which does nothing to inform or help Nextdoor and Pinterest's users.

141.    The Act is also underinclusive because its central definition and many exclusions create enormous gaps in the State's regulatory regime. Glaringly, the Act's regulatory regime entirely excludes websites that would meet the Act's definition of "social media platform"—and which permit users to post content in similar ways that implicate the State's purported interest in protecting children—but have 100,000 or fewer "active users in Colorado." § 6-1-1601(4)(a)(I).

142.    Moreover, the Act is underinclusive in that it does not apply to a 17-year-old staying up until 3:00 a.m. streaming shows on Hulu, but it requires warnings when that student is up late watching lessons for school on YouTube. Similarly, it does not apply to a high schooler spending multiple hours on a gaming website like Roblox or Minecraft, despite the ability to socially interact on those services as well.

143.    In fact, the Act peculiarly seems to impose warning notifications for websites that are most likely to offer parental controls and engage in content moderation, while leaving unregulated many websites that lack such oversight. This is both underinclusive as to the unregulated websites and overinclusive as to the websites with existing parental controls and content moderation.

144.    Indeed, if Colorado were actually trying only to help Coloradans "understand[] more about how technology and health intersect" or assess the "impact of social media and problematic technology use on youth mental health," HB24-1136 § 1(h), (j), it would not have imposed a compelled speech requirement only with respect to *minors'* accounts. Under Colorado's view, it

should be equally important to educate adults who might be parents and may also be interested in this information.

145.    Research and history show that mandated disclosures are ineffective. Among other reasons, mandatory disclosures of information are ineffective because of what some scholars have called "the accumulation problem"—consumers today "confront so many disclosures daily and so many consequential disclosures yearly that they could not attend to (much less master) more than a few even if they wanted to." Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harvard Law School Forum on Corporate Governance and Financial Regulation (May 6, 2014), https://perma.cc/M6K3-6ZAY. The Act does not explain or justify how the warning notification requirements it imposes on covered websites will be any different.

146.    Even under the lower standard of intermediate scrutiny, the law remains unconstitutional as it burdens substantially more speech than necessary; does not directly advance a substantial governmental interest; and is not properly tailored for the reasons explained above.

147.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members of their fundamental First Amendment rights and will irreparably harm Plaintiff and its members.

**COUNT II**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(WARNING NOTIFICATION REQUIREMENT AND CENTRAL**
**COVERAGE DEFINITION § 6-1-1601(1)-(4))**

148.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

149.    The Act's warning notification provisions, § 6-1-1601(1)-(3), and central coverage definition, § 6-1-1601(4), are unconstitutionally vague, violating principles of free speech and due process.

150.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). And a law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment. *FCC*, 567 U.S. at 253-54.

151.    Here, many websites will lack notice of whether they are regulated by the Act at all.

152.    And even if the Act's regulatory scope were perfectly clear (and it is not), covered websites have no notice of what message they are compelled to speak.

153.    The Act's central coverage definition fails to provide necessary notice. In general, the Act's central coverage definition and its exclusions use undefined and vague terms to determine which websites must comply with the Act's mandates. For example, the Act does not define "primarily," "incidental to," "predominant," "substantial," or "generally." § 16-1-1601(4)(b).

154.    The Act does not define what it means for a website to "[i]nclude[] a substantial function to allow users to interact socially." § 6-1-1601(4)(a)(IV). It is difficult or impossible to banish only the "social[]" aspects of human interaction, or to know where the line is between "social" and, say, "business" or "professional" interaction. Almost by definition, any medium that allows interaction of any kind necessarily allows social interaction, too. Thus, almost all websites that enable any kind of interaction among users could plausibly be covered by the Act if they meet the Act's other coverage requirements.

155.    Nor does the Act define what it means for users to use a website "for the purpose of allowing" the creation, sharing, and viewing of user-generated content. § 6-1-1601(4)(a)(II). The Act does not specify whose purpose—the user's, or the website's, or both—is pertinent.

156.    The Act likewise does not define what it means to exclude websites based on their "predominant or exclusive function." § 6-1-1601(4)(b); *see Griffin II*, 2025 WL 978607, at *15 (concluding coverage definition with similar language was unconstitutionally vague). For example, many people use LinkedIn for "career development opportunities" and "professional networking," § 6-1-1601(4)(b)(XIV), but many others use it for other kinds of interpersonal interaction. The same is true of Slack, which many people and businesses use for "[f]acilitating communication within a business or an enterprise among employees." § 6-1-1601(4)(b)(IX). It is therefore not clear what the "predominant" function on those services—and others—is.

157.    Moreover, the Act excludes certain websites that provide "chat, comment, or interactive functionality that is provided *incidental to*" certain online services. § 6-1-1601(4)(b)(VI) (emphasis added). Just like "predominant or exclusive function," "incidental to" is vague.

158.    Many websites will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin II*, 2025 WL 978607, at *15. Therefore, "[c]ompanies must choose between risking unpredictable and arbitrary enforcement . . . and implementing the Act's . . . requirements. . . . Such ambiguity renders a law unconstitutional." *Id.* at *16; *FCC*, 567 U.S. at 253-54.

159.    The Act's central coverage definition is integral to Section 4's substantive provisions; therefore, the vague central coverage definition renders Section 4 of the Act invalid in its entirety.

160.    In addition, the Act's operative warning notification provisions, § 6-1-1601(1)-(3), are independently vague because they fail to explain what the warnings must contain or how they must be presented.

161.    For example, it is unclear whether the timing-based "pop-up or full screen notification," § 6-1-1601(1)(b), requires covered websites to provide minor users information about "the impact of social media on the developing brain, and the mental and physical health of youth users," § 6-1-1601(2), whether it requires only information about the time or length of use, or something else entirely.

162.    Without knowing the exact contours of what they are required to publish or speak, covered websites will inevitably publish *more* compelled speech to avoid liability, which worsens the First Amendment injury.

163.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members of their fundamental First Amendment and Due Process rights and will irreparably harm Plaintiff and its members.

## COUNT III
## EQUITABLE RELIEF

164.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

165.    Section 6-1-1601 violates federal law and deprives Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

166.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing Section 4 of the Act against Plaintiff and its members.

## COUNT IV
### 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
### DECLARATORY RELIEF

167.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

168.    The Act violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution, and thereby deprives Plaintiff and its covered members of enforceable rights.

169.    Section 4 of the Act is unlawful and unenforceable because it violates the First Amendment to the Constitution and thereby deprives Plaintiff and its covered members of enforceable rights. Section 6-1-1601 also relies on an unconstitutional central coverage definition of covered "social media platforms." § 6-1-1601(4).

170.    Section 4 of the Act is also unlawful and unenforceable because it is unconstitutionally vague in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff and its covered members of enforceable rights.

171.    The unlawful portions of Section 4 of the Act are not severable from the rest of that Section. The entire Section is therefore unlawful and unenforceable.

172.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

173.    This Court can and should exercise its equitable power to enter a declaration that Section 4 of the Act, § 6-1-1601, is unconstitutional and otherwise unlawful.

### PRAYER FOR RELIEF

Plaintiff requests an order and judgment:

a.   declaring that Colorado House Bill 24-1136, § 6-1-1601, is unlawful;

   b.   declaring that Colorado House Bill 24-1136, § 6-1-1601, violates the First Amend-
ment to the Constitution, as incorporated by the Fourteenth Amendment, both facially
and as applied to Plaintiff's regulated members;

   c.   declaring that Colorado House Bill 24-1136 is void for vagueness under the First
Amendment and the Due Process Clause of the Fourteenth Amendment to the Consti-
tution;

   d.   enjoining Defendant and his agents, employees, and all persons acting under his di-
rection or control from taking any action to enforce Section 4 of Colorado House Bill
24-1136, § 6-1-1601, against Plaintiffs' members;

   e.   entering judgment in favor of Plaintiff;

   f.   awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, includ-
ing attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C.
§ 1983 claims against state officials; and

   g.   awarding Plaintiff all other such relief as the Court deems proper and just.

Dated: August 14, 2025               Respectfully submitted,

                                    */s/ Jeremy Evan Maltz*
                                    Jeremy Evan Maltz
                                    LEHOTSKY KELLER COHN LLP
                                    200 Massachusetts Avenue, NW,
                                      Suite 700
                                    Washington, DC 20001
                                    (512) 693-8350
                                    jeremy@lkcfirm.com

                                    Jared B. Magnuson
                                    LEHOTSKY KELLER COHN LLP
                                    3280 Peachtree Road NE
                                    Atlanta, GA 30305
                                    (512) 693-8350
                                    jared@lkcfirm.com

                      *Attorneys for Plaintiff NetChoice*