## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| NETCHOICE,<br><br>*Plaintiff*,<br><br>v.<br><br>PHILIP J. WEISER, in his official capacity as Attorney General of Colorado,<br><br>*Defendant*. | Civil Action No. 1:25-cv-2538 |

## PLAINTIFF NETCHOICE'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## Table of Authorities

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)................................................................2, 9, 10, 12, 15

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021)................................................................25

*Am. Commc'ns Ass'n, C.I.O., v. Douds*,
  339 U.S. 382 (1950)................................................................12

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021)................................................................20, 21

*Aposhian v. Barr*,
  958 F.3d 969 (10th Cir. 2020) ................................................25

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ..............................................25

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983)..................................................................13, 14

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)................................................................19, 20, 22, 23

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022) ..................................................16, 17

*Chamber of Com. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ................................................25

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
  747 F. Supp. 3d 1011 (W.D. Tex. 2024).................................2, 19, 22, 23

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
  2025 WL 1570007 (N.D. Fla. June 3, 2025) ...........................1, 4, 8

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975)................................................................20

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)................................................................23

*Free Speech Coal., Inc. v. Paxton*,
  145 S. Ct. 2291 (2025) ...........................................................................9, 18, 19

*Free Speech Coal., Inc. v. Paxton*,
  95 F.4th 263 (5th Cir. 2024) ..............................................................16, 18

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018).............................................................................2, 9, 11

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010)...................................................................................8

*Jordan v. Pugh*,
  425 F.3d 820 (10th Cir. 2005) ...............................................................24

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952)...................................................................................15

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001)..............................................................................20, 22

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010)...................................................................................16

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024).................................1, 3, 4, 5, 8, 9, 10, 12, 13, 14, 21

*N. N.M. Stockman's Ass'n v. United States Fish & Wildlife Serv.*,
  30 F.4th 1210 (10th Cir. 2022) .................................................................7

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015) ............................................................11, 17

*Nat'l Ass'n of Wheat Growers v. Bonta*,
  85 F.4th 1263 (9th Cir. 2023) ...................................................................17

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018).................................................9, 14, 15, 16, 20, 21

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024)....................................................................................2

*NetChoice v. Carr*,
  2025 WL 1768621 (N.D. Ga. June 26, 2025)................................1, 4, 8, 20

*NetChoice, L.L.C. v. Fitch*,
  134 F.4th 799 (5th Cir. 2025) ...................................................................8

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ........................................................1, 13, 14, 18, 22

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025) .................................................................2, 20

*NetChoice, LLC v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025) .............................2, 3, 8, 19, 23, 24

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024).............................................2, 19, 20, 22, 23

*NetChoice, LLC v. Yost*,
778 F. Supp. 3d 923 (S.D. Ohio 2025) .......................................................2, 8, 19, 22

*Ohio v. EPA*,
603 U.S. 279 (2024)..................................................................................................25

*Packingham v. North Carolina*,
582 U.S. 98 (2017)...........................................................................................1, 4, 13

*Proctor & Gamble Co. v. Haugen*,
222 F.3d 1262 (10th Cir. 2000) ..............................................................................13

*In re R.M.J.*,
455 U.S. 191 (1982)..................................................................................................16

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)..................................................................................................19

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)..........................................................................................8, 9, 14

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)....................................................................................................25

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)............................................................................................19, 23

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000).............................................................................................21, 22

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001)..................................................................................................16

*United States v. Wenger*,
427 F.3d 840 (10th Cir. 2005) ..............................................9, 12, 13, 14, 15, 16

*Verlo v. Martinez*,
820 F.3d 1113 (10th Cir. 2016) ....................................................................7, 25

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ...........................................................................................1

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) .......................................1, 5, 8, 9, 11, 18

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
471 U.S. 626 (1985) .........................................................15, 16, 17, 18

**Statutes**

Colo. Rev. Stat. § 6-1-103 ...................................................................................7

Colo. Rev. Stat. § 6-1-110 ...................................................................................7

Colo. Rev. Stat. § 6-1-112 ...................................................................................7

Colo. Rev. Stat. § 6-1-1601 ........................1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 14, 15, 17, 19, 21, 23, 24

Colo. Rev. Stat. § 22-2-127.8 ...............................................................................6

**Other Authorities**

Claire Cain Miller, *Everyone Says Social Media is Bad for Teens. Proving It Is Another Thing*, The New York Times (June 17, 2023), https://perma.cc/385F-LVYZ ....................................................................................................................15

Colorado Department of Education, Media Literacy, https://perma.cc/9VS7-7W4E ...................................................................................................................3

Colorado House Bill 24-1136 ...............................................1, 3, 4, 6, 11, 22

ExcelinEd, State Approaches to Digital Literacy Instruction (Feb. 2024), https://perma.cc/W94F-TYYE .......................................................................22

Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harvard Law School Forum on Corporate Governance (May 6, 2014), https://perma.cc/WXG8-BB4W ..........................................................23

U.S. Surgeon General, Social Media and Youth Mental Health, The U.S. Surgeon General's Advisory (2023), https://perma.cc/D2TM-KHRH ...............................17

# Table of Contents

Introduction ................................................................................................................. 1

Background .................................................................................................................. 2

    A. Factual background ........................................................................................... 2

        1. NetChoice members' websites disseminate and enable large amounts of fully protected speech. ................................................................................... 2

        2. Ample private resources exist to provide users with information about social media use and to provide parents with means of overseeing their minor children's internet use. ........................................................................ 3

    B. Colorado House Bill 24-1136 Section 4 ........................................................... 4

Argument ..................................................................................................................... 7

    I. NetChoice is likely to succeed on the merits of its claim that the Act's compelled-speech requirements violate the First Amendment. ......................... 8

        A. The Act's warning-notification requirements trigger strict First Amendment scrutiny for multiple reasons. ...................................................... 8

            1. The Act's requirements trigger strict scrutiny as compelled speech. .................... 9

            2. The Act's central coverage definition is content-based, which independently subjects the Act's compelled warnings to strict scrutiny. ..................................... 19

        B. The Act's warning notification requirement fails strict scrutiny and any other form of heightened scrutiny. ............................................................ 20

            1. The State lacks a sufficient governmental interest in compelling covered websites to disseminate speech designed to deter their users. ............................. 20

            2. The Act's warning notification is unduly burdensome, and is otherwise not properly tailored. ....................................................................................... 21

    II. NetChoice is likely to succeed on its claim that the Act's compelled-speech requirements and central coverage definition are unconstitutionally vague. .................... 23

    III. NetChoice meets all the remaining factors for a preliminary injunction. ......................... 25

Conclusion ................................................................................................................. 25

## Introduction

Colorado House Bill 24-1136 ("Act") flouts the one "fixed star in our constitutional constellation" by compelling private websites to act as mouthpieces for the State. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).[1] Section 4 of the Act, § 6-1-1601 would compel a content-based and vague collection of "social media platforms" to opine on the highly controversial purported effects of social media use on the health of minors, and to otherwise provide repeated and burdensome full-screen warning notifications to minors. Accordingly, Section 4 of the Act violates the First Amendment and Due Process Clause, as other courts have recognized in the context of analogous laws. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121-22 (9th Cir. 2024) (invalidating compelled-speech requirement); *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (similar). NetChoice therefore requests that this Court enjoin Defendant's enforcement of § 6-1-1601 against NetChoice's covered members before the Act takes effect on January 1, 2026.

"[S]ocial media" websites disseminate a "staggering amount" of protected speech across "billions" of "posts" to adults and minors. *Moody v. NetChoice, LLC*, 603 U.S. 707, 719, 734 (2024). They allow everyone to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all "protected [by the] First Amendment" from governmental interference. *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (citation omitted). In addition, these websites "engage[] in expression" by "display[ing]," "compil[ing,] and curat[ing]" protected speech. *Moody*, 603 U.S. at 716-17, 728. That is why courts nationwide have enjoined enforcement of laws deterring, burdening, and restricting minors' (and adults') access to these websites.[2]

---

[1] This lawsuit only challenges House Bill 24-1136 Section 4 (enacting § 6-1-1601), and thus references to "the Act" or "HB24-1136" refer only to Section 4. Unless otherwise noted, statutory citations refer to the Colorado Revised Statutes. This Motion uses "websites" to refer to websites and applications and "covered websites" to refer to all digital services the Act covers.

[2] *See NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *Comput. &*

Colorado's attempt to compel these websites to speak also violates the First Amendment. After all, the "government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). "[M]easures compelling speech are at least as threatening" as "restrictions on what can be said." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). Those principles apply with special force here, where the Act compels speech from entities engaged in expressive activity. *E.g.*, *303 Creative*, 600 U.S. at 586. And to the extent that the State is attempting to deter minors from accessing covered websites, "a government official cannot do indirectly" through compelled speech "what she is barred from doing directly" through restrictions on minors' access to covered websites. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (citation omitted).

Compounding the problems, the Act's provisions are unconstitutionally vague. The compelled-speech provisions lack any indication regarding the content of the notification to minor users, leaving websites to guess as to how to comply with the Act. And the central "[s]ocial media platform" coverage definition's complete lack of clarity leaves many websites across the internet uncertain about whether they must speak the State's preferred message. § 6-6-1601(4).

## Background

### A.    Factual background

#### 1.    NetChoice members' websites disseminate and enable large amounts of fully protected speech.

NetChoice is an internet trade association. Cleland Decl. ¶¶ 3-5. Based on the Act's definitions, the Act regulates some websites operated by NetChoice members,

---

*Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

including: (1) Automattic (Tumblr); (2) Meta (Facebook, Instagram, and Threads); (3) Nextdoor; (4) Pinterest; (5) Snap Inc. (Snapchat); (6) Reddit; (7) X; and (8) YouTube. *See id.* ¶¶ 16-24. These "social media" websites "allow users to upload content . . . to share [it] with others," and have "a staggering amount of content" across "billions" of "posts." *Moody*, 603 U.S. at 719, 734; Cleland Decl. ¶¶ 6-8; Blumenfeld Decl. ¶¶ 3, 6-10; Geary Decl. ¶¶ 3-4; Murphy Decl. ¶¶ 4-14, 15-27. In addition, these websites "engage[] in expression" by "display[ing]," "compil[ing,] and curat[ing]" protected, third-party speech. *Moody*, 603 U.S. at 716-17, 728; *e.g.*, Murphy Decl. ¶¶ 10-14.

> **2.     Ample private resources exist to provide users with information about social media use and to provide parents with means of overseeing their minor children's internet use.**

Covered websites recognize that their services should be used responsibly. This is especially true for younger users, which is why many members provide resources to minor users and their parents about responsible and safe use of social media and user wellbeing. Cleland Decl. ¶¶ 9-12; Blumenfeld Decl. ¶ 10; Geary Decl. ¶¶ 8-9; Murphy Decl. ¶¶ 55-57. For example, Meta provides expert-backed advice on media usage by child age group through its guide developed with the Digital Wellness Lab at Boston Children's Hospital. Murphy Decl. ¶ 57. Similarly, YouTube provides resources to minors and their parents, including its "Family Guide to Teen Content Creation." Blumenfeld Decl. ¶ 22.

Likewise, many third parties—with different perspectives about how to best use social media—provide their own resources about online use. And of course, governmental actors can engage in their own speech about social media and provide resources themselves. *See* Colorado Department of Education, Media Literacy, https://perma.cc/9VS7-7W4E. In fact, Section 2 of the Act— which NetChoice does *not* challenge—does just that.

In addition to these resources, "many tools exist to help parents" with overseeing their minor children's social media use. *Griffin*, 2025 WL 978607, at *3 (collecting evidence); *see*

*Uthmeier*, 2025 WL 1570007, at *18; *Carr*, 2025 WL 1768621, at *18-19. That includes tools provided by both members and third parties for both users and parents. *See* Cleland Decl. ¶ 14; Blumenfeld Decl. ¶¶ 17-27; Geary Decl. ¶ 7; Murphy Decl. ¶¶ 32-40. And covered NetChoice members also engage in content moderation to address potentially harmful content on their services. Cleland Decl. ¶ 13.c; Blumenfeld Decl. ¶¶ 28-34; Geary Decl. ¶ 6; Murphy Decl. ¶¶ 41-54.

### B.    Colorado House Bill 24-1136 Section 4

**1. Covered actors and activities. § 6-1-1601(4).** The Act compels speech from a content-based set of internet "actors" engaged in certain "activities." *Moody*, 603 U.S. at 724. The Act regulates "[s]ocial media platform[s]," which it defines as any website meeting four requirements:

> (I) Has more than one hundred thousand active users in Colorado;
> (II) Permits a person to become a registered user, establish an account, or create a public or semi-public profile for the purpose of allowing users to create, share, and view user-generated content through the account or profile;
> (III) Enables one or more users to create or post content that can be viewed by other users of the medium; and
> (IV) Includes a substantial function to allow users to interact socially with each other within the service or application.

§ 6-1-1601(4)(a).[3]

The Act regulates websites that "allow users to upload content . . . to share with others" and allowing those "viewing the content . . . [to] react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719. This includes NetChoice's covered members services identified above at p.3. The Supreme Court has confirmed NetChoice members as examples of operators of services protected by the First Amendment: "Facebook," "Twitter" (now X), and "YouTube." *See Moody*, 603 U.S. at 719, 724; *Packingham*, 582 U.S. at 104.

---

[3] When discussing the Act's requirements, this Motion also uses the terms "minor," "adult," and "user" to refer only to such account users and minors in Colorado.

In addition, the Act excludes a litany of more than 15 different kinds of websites based on their content. It excludes websites with the following "predominant or exclusive function[s]": "electronic mail"; "commercial transactions" for "online shopping or e-commerce"; "teleconferencing and video conferencing"; "crowd-sourced content for reference guides"; "cloud-based electronic services"; "news, sports, [and] entertainment"; "reference guides such as encyclopedias and dictionaries"; "interactive gaming"; "virtual gaming"; "businesses, products, or travel information"; "communication within a business"; "enterprise software"; "streaming service[s]"; "technical support"; "career development opportunities"; "academic or scholarly research"; and "news information for a mass medium." § 6-6-1601(4)(b). The Act also excludes websites based on speaker, such as websites "under the direction of an educational entity." *Id.*

Because the Act targets "social media" websites, this Court "need not speculate" about "hypothetical or imaginary cases." *X Corp.*, 116 F.4th at 899 (cleaned up). The Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply in the context of distinct laws. 603 U.S. at 724-25; *see* Cleland Decl. ¶ 25. The Act excludes "email." *Moody*, 603 U.S. at 725; *see* § 6-1-1601(4)(b)(I). The Act's exclusion of "commercial transactions" for "[o]nline shopping or e-commerce," § 6-1-1601(4)(b)(II)(B), excludes "payment service[s]" and "online marketplace[s]," *Moody*, 603 U.S. at 725. The Act's exclusion of websites where the "content . . . is preselected by the provider and not user generated," § 6-1-1601(4)(b)(VI), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725.

**2. The Act's compelled-speech warning notification requirements. § 6-1-1601(1).** The Act compels speech from covered websites, in the form of either one of two state-compelled messages to minor users. *See* § 6-1-1601(1) ("social media platform must establish a function that either" satisfies (1)(a) or (1)(b)).

First, under § 6-1-1601(1)(a), covered websites can "provide users who are under the age of eighteen with information about their engagement in social media that helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users." § 6-1-1601(2). This compels covered websites to opine on the highly controversial topic of "the impact of social media" on "mental and physical health" of minors, which is the subject of intense scholarly and social debate—and active litigation.

Worse, Colorado limits the "information" that websites can use to form their state-compelled opinions: "The information must be supported by data from peer-reviewed scholarly articles or the sources included in the mental health and technology resource bank established" and maintained by the Colorado Department of Education. § 6-1-1601(2).[4] The Act also requires Colorado officials to "establish standards" for notifications that: (1) "Recommend intervals for notification frequency"; (2) "Provide sample messaging for the content of the notification"; (3) "Be informed by data and research on the efficacy of notifications"; and (4) "Recommend the age range of users who would most benefit from notifications." § 6-1-1601(5).

Second, under § 6-1-1601(1)(b), covered websites can alternatively "[d]isplay[] a pop-up or full screen notification to a user who attests to being under the age of eighteen when the user: (I) Has spent one cumulative hour on the social media platform during a twenty-four-hour period; or (II) Is on a social media platform between the hours of ten p.m. and six a.m." § 6-1-1601(1)(b). This message "must repeat at least every thirty minutes." § 6-1-1601(3).

---

[4] Section 2 of the Act requires the Colorado Department of Education to create (with the assistance of a "stakeholder group") and maintain a "resource bank" that is made up of "existing evidence-based, research-based scholarly articles and promising program materials and curricula pertaining to the mental and physical health impacts of social media use by youth, internet safety, and cybersecurity." § 22-2-127.8(1)(a).

The Act is vague as to what content a website must include in a timing-based notification under § 6-1-1601(1)(b). One possibility is that the warning must provide the same information required by the first option above: "information about [users'] engagement in social media." § 6-1-1601(2). That is because the statute provides: "The function established pursuant to subsection (1) of this section"—which covers *both* the information warning under (1)(a) and the timing-based warning under (1)(b)—"must provide [minors] with information about their engagement." *Id.*

But the Act also states that the compelled speech under § 6-1-1601(1)(a)—but not § 6-1-1601(1)(b)—must be "be informed by the standards established in subsection (5)," § 6-1-1601(1)(a). This may reflect that the timing-based notification in § 6-1-1601(1)(b) may require covered websites to display *only* information about how long the user has been using the service or the time at which the user is using the service. *See* § 6-1-1601(1)(b)(I)-(II); § 6-1-1601(3) ("If the social media platform establishes the function described in subsection (1)(b) of this section.").

**3. Enforcement**. The Act amends Colorado's consumer protection laws, which are enforceable by the Colorado Attorney General. § 6-1-103. The Attorney General may pursue injunctions and civil penalties to enforce the Act. *See, e.g.*, §§ 6-1-110, 6-1-112. The potential civil penalties for violations of the Act are substantial—up to $20,000 for "each violation." § 6-1-112(1)(a). Every "consumer or transaction involved" triggers a new "violation." *Id.*

## Argument

NetChoice is entitled to a preliminary injunction because it can "demonstrate: (1) a likelihood of success on the merits; (2) a likelihood [of] irreparable harm . . . ; (3) the balance of equities is in [NetChoice]'s favor; and (4) the preliminary injunction is in the public interest." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (citation omitted). NetChoice has associational standing to assert its members' rights. *N. N.M. Stockman's Ass'n v. United States Fish & Wildlife*

*Serv.*, 30 F.4th 1210, 1219 (10th Cir. 2022).[5]

NetChoice raises both a facial challenge to Section 4 and challenges to Section 4 as applied to the members and services listed at p.3. Section 4 is properly "struck down in its entirety" because its "unconstitutional applications substantially outweigh its constitutional ones . . . judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723-24 (citation omitted). This inquiry "first" asks what "actors" and "activities" the Act regulates. *Id.* at 724; *see supra* pp.4-5. It "next" compares the Act's unconstitutional applications to any constitutional ones, asking whether the former "substantially outweigh" the latter. *Moody*, 603 U.S. at 724. Here, in "every application to a covered social media company," the Act "raise[s] the same First Amendment issues." *X Corp.*, 116 F.4th at 899 (citation omitted). No "factual development would help illuminate" why these requirements are unconstitutional. *Griffin*, 2025 WL 978607, at *7.

At a minimum, the Act is invalid as applied to members' regulated services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).

I.      **NetChoice is likely to succeed on the merits of its claim that the Act's compelled-speech requirements violate the First Amendment.**

A.      **The Act's warning-notification requirements trigger strict First Amendment scrutiny for multiple reasons.**

The Act's requirements trigger strict scrutiny for two independent reasons. First, "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech" and thus triggers strict scrutiny. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). Second, the Act selects websites for compelled speech based on the content on their

---

[5] *E.g.*, *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025); *Carr*, 2025 WL 1768621, at *5-6; *Yost*, 778 F. Supp. 3d at 938-46; *Uthmeier*, 2025 WL 1570007, at *6-7.

websites. Content-based laws that regulate speech are "'presumptively unconstitutional and may be justified only if' they satisfy strict scrutiny." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2302 (2025) ("*FSC*") (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

### 1.    The Act's requirements trigger strict scrutiny as compelled speech.

The Act's compelled-speech requirements unconstitutionally compel covered websites to engage in controversial speech designed to deter users from accessing their services. That triggers strict First Amendment scrutiny. Accordingly, neither commercial-speech intermediate scrutiny nor *Zauderer*'s standard for disclosure of "factual and uncontroversial information" in commercial advertising applies. *United States v. Wenger*, 427 F.3d 840, 849 (10th Cir. 2005).

**a.** The freedoms of speech and of the press protected by the First Amendment "include[] both the right to speak freely and the right to refrain from speaking at all." *Janus*, 585 U.S. at 892 (citation omitted). Put another way, the "government may not compel a person to speak its own preferred messages." *303 Creative*, 600 U.S. at 586. All manner of private entities enjoy this right, including "social-media platforms." *Moody*, 603 U.S. at 719.

Compelled-speech requirements trigger strict First Amendment scrutiny because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley*, 487 U.S. at 795; *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citations omitted); *X Corp.*, 116 F.4th at 900; Murphy Decl. ¶ 62. That is true for *all* private entities, from hardware stores to book publishers. And it is especially true here, where the Act would compel speech from entities that the Supreme Court recognizes "engage[] in expression" by "compil[ing] and curat[ing]" third-party speech. *Moody*, 603 U.S. at 716-17, 728; *see* Murphy Decl. ¶ 65. Here, the Act compels speech in (potentially) two different ways—each triggering strict First Amendment scrutiny.

*First*, § 6-1-1601(1)(a) would require covered websites to opine on "the impact of social

9

media on the developing brain and the mental and physical health of youth users." § 6-1-1601(2); *see* Blumenfeld Decl. ¶ 40. To substantiate these compelled opinions, the State limits the information that websites may use: "data from peer-reviewed scholarly articles or the sources included in" the State's "mental health and technology resource bank." § 6-1-1601(5). The requirement to provide this compelled speech even *once* based on the State's self-selected universe of materials already offends the First Amendment. But the First Amendment injury will be further compounded by the State's "standards," that will, among other things: (1) "Recommend intervals for notification frequency"; and (2) "Provide sample messaging for the content of the notification." *Id.*

In other words, the Act compels covered websites to speak about the controversial and developing body of research on the purported effects of *some* social media websites on *some* cohorts of minors. *E.g.*, Geary Decl. ¶ 10. That speech must rely only on a state-preferred subset of research, accord with the State's own preferred "sample messaging," and be repeated at regular "intervals." § 6-1-1601(5). That would be enough. But these state-mandated messages must form part of the "compilations" of third-party speech, which would alter the "expressive product[s] that most reflects [covered websites'] views and priorities." *Moody*, 603 U.S. at 718.

It does not matter that websites may purportedly have some flexibility to author the precise wording of these warnings. The fact that the State is restricting the universe of materials from which a covered website can determine its message, § 6-1-1601(2), already flouts the basic First Amendment "principle that the government may not interfere with 'an uninhibited marketplace of ideas,'" *303 Creative*, 600 U.S. at 585 (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)), and "invade[s] the sphere of intellect and spirit which it is the purpose of the First Amendment to reserve from all official control," *id.* (quoting *Barnette*, 319 U.S. at 642); *see* Murphy Decl. ¶ 63.

In all events, context shows that the "particular message" Colorado wishes these warning

10

notifications to convey is *negative* about these websites' own speech services. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 585 U.S. at 893. As demonstrated by the Act's legislative findings, Colorado wants to commandeer these websites to convey the State's own message to users that covered websites are harmful and should be avoided or rarely used. *See* HB24-1136 § 1. This violates the First Amendment. "[R]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for [it] to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes [this Act] more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) ("*NAM*") (citation omitted).

Even if covered websites were allowed to discuss the myriad benefits of social media use in their statements, § 6-1-1601(1)(a) would still be unconstitutional. The Ninth Circuit, for instance, has held that governments cannot require a similar range of covered websites to opine on how they interpret and apply their *own* "content-moderation practices." *X Corp.*, 116 F.4th at 901.

At bottom, § 6-1-1601(1)(a)'s compelled-speech requirement puts websites to an unconstitutional choice. *E.g.*, Murphy Decl. ¶ 64. On one hand, they can make statements that they believe to be truthful about the use of "social media" services—which may then become fodder for claims alleging misrepresentation. On the other hand, they can make statements they believe to be inaccurate about the purported harms of their services to avoid enforcement risk under the Act, which likewise could be used against the services in ongoing and prospective litigation.

*Second*, the Act alternatively would compel websites to provide a "pop-up or full screen notification" when a minor user "(I) Has spent one cumulative hour on the social media platform during a twenty-four-hour period; or (II) Is on a social media platform between the hours of ten p.m. and six a.m." § 6-1-1601(1)(b); *see* Blumenfeld Decl. ¶ 41. Then websites would need to

"repeat" these warnings "at least every thirty minutes after the initial notification." § 6-1-1601(3). As addressed above at pp.6-7, this provision could require the same warnings about the supposed "impact" of social media as detailed in § 6-1-1601(2). In that case, it unconstitutionally compels speech for all the reasons discussed above.

Even if this option only required notifications about the time spent on the service or the time of day (which must be repeated every 30 minutes), that too is unconstitutionally compelled speech. The purpose and practical desired effect of these notifications is to deter users of the service. Likewise, it would "[]dilute[]," *303 Creative*, 600 U.S. at 586, and interfere with covered websites' expressive compilations with the government's preferred message, *Moody*, 603 U.S. at 719. If the Wall Street Journal were required to repeatedly display a full screen notification to users when they read an article at a certain time of day or for a certain length of time, implying that the user should stop reading, few would question that as an improper governmental attempt to dissuade readers. The same would be true if video game or streaming companies were singled out to provide warnings to their users about the time spent playing a video game or watching cartoons. *See Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 402 (1950) ("Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes."). The First Amendment does not apply differently to social media websites. *Moody*, 603 U.S. at 719.

**b.** The Act does not compel commercial speech or require companies to append disclosures to just commercial speech. The Tenth Circuit relies on three factors when determining whether speech is commercial, guided by "common sense": whether the speech (1) is "concededly an advertisement"; (2) "refers to a specific product"; or (3) "is motivated by an economic interest." *Wenger*, 427 F.3d at 847 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983));

*Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000) (similar); *see Bonta*,

113 F.4th at 1119 (Ninth Circuit's similar analysis).

Here, the Act does not require disclosures appended to commercial speech. Requiring companies to engage in speech—when they otherwise would not speak at all—is not a regulation of commercial speech. In other words, the government cannot compel private entities to speak in the first instance, and then label that speech "commercial." That is why the *Bolger* factors presuppose that an entity is already engaging in speech that the government then regulates—and not that the government is forcing those companies to create speech. When a company is not already engaging in some form of purportedly commercial speech that the government then decides to regulate, the *Bolger* factors necessarily fail.

Nor can Defendant argue that the websites themselves—and the broad array of fully First Amendment protected speech on them—is commercial speech under either the *Bolger* factors or plain "common sense." *Wenger*, 427 F.3d at 847. The Supreme Court has recognized that social media websites disseminate "a staggering amount of content." *Moody*, 603 U.S. at 719. And that content includes all manner of fully protected speech, which is why social media websites are "what for many are the principal sources for knowing current events, . . . and otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. In addition, "social media" companies—including NetChoice members' services such as Facebook and YouTube—often "curate their feeds by combining 'multifarious voices' to create a distinctive expressive offering." *Moody*, 603 U.S. at 711 (citation omitted). The fact that a subset of this content is third-party advertisements for distinct products and services offered by those third parties does not change the analysis, as the speech the State seeks to compel has nothing to do with those third-party products or services. In any case, the diverse array of fully protected, non-commercial

13

speech on all manner of topics "substantially outweigh[s]" the number of third-party advertise-ments that may be displayed on the services. *Moody*, 603 U.S. at 724. So, whatever commercial-speech characteristics the websites have, those aspects do not "retain[]" their "commercial char-acter" because they are "inextricably intertwined with otherwise fully protected speech"—the compilations of third-party speech disseminated by covered websites. *Riley*, 487 U.S. at 796.

The three *Bolger* factors confirm this conclusion. First, social media websites themselves are not "concededly . . . advertisement[s]." *Wenger*, 427 F.3d at 847. Again, social media websites *publish* some third-party advertisements. But so does the Denver Post, ESPN, and Hulu. Those publications, telecasts, and streaming services are not "commercial speech." Nor are social media websites. Regardless, the compelled speech here is not *about* those advertisements. Rather, it is about general use of the covered websites—either the hotly contested "impact" of the websites or the time spent engaging in or with the protected speech on them. § 6-1-1601(1)-(2).

Second, the warning requirements do not "refer to a *specific* product." *Wenger*, 427 F.3d at 847 (emphasis added); *see Bonta*, 113 F.4th at 1120 (compelled speech requirements went "be-yond opining about [websites'] products or services to opine on highly controversial issues of public concern"). In fact, the compelled speech does not concern any particular website or service at all; instead, the Act requires warnings about "the impact of social media" *generally*. § 6-1-1601(2). Thus, the Act's compelled-speech warning requirements are not "limited to . . . infor-mation about the terms under which [each covered websites'] services will be available.'" *NIFLA*, 585 U.S. at 768 (cleaned up) (quoting *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985)). Rather, they require the vast majority of covered websites "to disclose information about" *others'* services. *Id.* at 769.

The developing body of research about "social media" does not contain information about

14

*every* social media website regulated by the Act. *E.g.*, Blumenfeld Decl. ¶ 40.e. In fact, researchers disagree about what "constitutes" "social media." *See, e.g.*, Claire Cain Miller, *Everyone Says Social Media is Bad for Teens. Proving It Is Another Thing*, The New York Times (June 17, 2023), https://perma.cc/385F-LVYZ. Even if there were a consensus definition, research about the effects of such websites is inconclusive and evolving. Plus, there is no "peer-reviewed" literature about *all* of the websites regulated by the Act. § 6-1-1601(2). As a result, most covered websites will need to opine about the equivocal effects of *other* services. Even assuming that the government could require social media companies to opine about their own services (it cannot), the government cannot require those companies to opine about *other* companies' services. *NIFLA*, 585 U.S. at 769.

The timing-based notification in § 6-1-1601(1)(b) fares no better. States cannot compel directors or streaming services to include repeated messages in their films or shows about the time of day or how long people have been watching under the guise of "commercial speech."

Finally, the compelled warnings are not designed to target speech "motivated by an economic interest in selling the product." *Wenger*, 427 F.3d at 847. Similar to the "advertisement" prong above, it is true that most covered websites operate for profit. That is not enough to render the services commercial speech. *See 303 Creative*, 600 U.S. at 600 ("the First Amendment extends to all persons engaged in expressive conduct, including those who seek profit"). Otherwise, any number of publications, including books, newspapers, magazines, television channels, streaming services, and theaters' offerings could be deemed "commercial speech." Nor are movies, songs, and plays themselves commercial speech. Simply because speech is "published and sold for profit does not prevent [it] from being a form of expression whose liberty is safeguarded by the First Amendment." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

**c.** Because the Act does not compel commercial speech, *Zauderer* does not apply.

15

The Supreme Court has emphasized that laws compelling disclosures are generally treated no differently from any other law compelling speech. *E.g.*, *NIFLA*, 585 U.S. at 771. *Zauderer* provides a narrow exception to that rule, for non-burdensome, "purely factual and uncontroversial" disclosures about a company's own services to cure "inherently misleading" "advertisements." *Zauderer*, 471 U.S. at 641, 651; *Wenger*, 427 F.3d at 849. As explained above at p.14, this Act does not regulate commercial advertising. Likewise, as explained above at pp.14-15, the Act is not "limited to . . . information about the terms under which [each covered websites'] services will be available.'" *NIFLA*, 585 U.S. at 768 (cleaned up) (quoting *Zauderer*, 471 U.S. at 651).

And the Supreme Court has never applied *Zauderer* to uphold compelled speech outside the context of correcting misleading advertising. That is because the government can outright *ban* misleading commercial speech, so it can also impose the less restrictive means of requiring disclosures to cure any misleading statements. *Zauderer*, 471 U.S. at 641. The Court has consistently described *Zauderer* as limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010); *e.g.*, *United States v. United Foods, Inc.*, 533 U.S. 405, 416 (2001); *In re R.M.J.*, 455 U.S. 191, 205 (1982).

Regardless, the compelled warnings at issue here are neither "factual" nor "uncontroversial," which also means *Zauderer* cannot apply. *Wenger*, 427 F.3d at 849. A subject matter is "controversial" where there is "robust disagreement by reputable scientific sources" and "scientific debate" on that issue. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). So the government cannot compel private entities to opine on issues "subject to good-faith scientific or evidentiary dispute" that are an "integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024).

Social media use generally—and among minors in particular—is subject to the kind of scholarly, social, and cultural debate that makes it "controversial" for purposes of *Zauderer*. Plus, minors' social media use it is the subject of active litigation. Take just one example: the Surgeon General's advisory cited in the Act. *See* HB24-1136 § 1(a). The Surgeon General noted that "robust" analysis of social media has "not yet been conducted" and that "[m]ore research is needed to fully understand the impact of social media." U.S. Surgeon General, Social Media and Youth Mental Health at 4, The U.S. Surgeon General's Advisory (2023), https://perma.cc/D2TM-KHRH. And that same Surgeon General advisory notes research showing many "benefits of social media use" for minors. *Id.* at 6. Thus, the very source that the Legislature used to support the Act's compelled speech acknowledges that debate about social media use entails "robust disagreement by reputable scientific sources." *Cal. Chamber of Com.*, 29 F.4th at 478.

In addition, the notifications compel websites to engage in speech designed to deter minor users. That message of deterrence is "controversial" because it is "fundamentally at odds with" covered websites' missions to be open and available for users, including minors, to access the wide range of protected speech on their services. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277-78 (9th Cir. 2023) (citation omitted); *e.g.*, Blumenfeld Decl. ¶¶ 10-11. Even if § 6-1-1601(1)(b)'s timing-based notification requires only information about how long the user has used the service and the time of day, that is still controversial because of *why* and *how* that notification is required. The Act's findings and language make clear that even time-related notifications are designed to discourage users from continuing to use covered websites' services. They also must be repeated every 30 minutes and take up the entire screen. The message to users is clear: Colorado would like users to stop using covered websites in particular. *See NAM*, 800 F.3d at 530.

Other Circuits' decisions illustrate why the Act's warnings are not factual, uncontroversial,

or commercial. The Ninth Circuit recently decided a pair of cases rejecting compelled-speech requirements. *Bonta* held unconstitutional a California law "requiring covered [online] businesses to opine on potential harm to children" from use of their respective services. 113 F.4th at 1117. It concluded that strict scrutiny applied, because the "requirement . . . regulates far more than mere commercial speech." *Id.* at 1119. A "business's opinion about how its services might expose children to harmful content online is not 'purely factual and uncontroversial.' " *Id.* at 1120.

The Ninth Circuit in *X Corp.* likewise held unconstitutional a separate California law that required digital services to "detail the company's policies and actions concerning certain state-specified categories of content." 116 F.4th at 899. *X Corp.* concluded that these requirements did not regulate or compel commercial speech, and "report[ing] whether and how they believe particular, controversial categories of content should be defined and regulated on their platforms" did not qualify for *Zauderer* review. *Id.* at 902.

The Fifth Circuit's decision in *Free Speech Coalition* similarly invalidated compelled warnings about online speech.[6] There, Texas required pornography websites to display "health warnings" to users about the purported effects of pornography. 95 F.4th at 279. Even assuming that the disclosures were factual, the Fifth Circuit concluded that they were not uncontroversial, and so not subject to *Zauderer* review. *Id.* at 282. A "compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *Id.* at 281-82. Texas could not overcome that hurdle. *Id.* Nor can Colorado here.

---

[6] The Supreme Court's recent decision in this case left the Fifth Circuit's compelled-speech ruling undisturbed. *FSC*, 145 S. Ct. at 2301.

### 2. The Act's central coverage definition is content-based, which independently subjects the Act's compelled warnings to strict scrutiny.

The Act's central "social media platform" coverage definition, § 6-1-1601(4), is content-based, which independently subjects the Act's compelled warnings to strict scrutiny. "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000)); *see FSC*, 145 S. Ct. at 2315 n.12 ("the distinction between bans and burdens makes no difference to the level of scrutiny" (quotation omitted)).

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011) (citation omitted). Content-based laws are "'presumptively unconstitutional and may be justified only if' they satisfy strict scrutiny." *FSC*, 145 S. Ct. at 2302 (quoting *Reed*, 576 U.S. at 163).

The Act both defines the scope of covered websites *and* excludes numerous other websites from its burdens based on their "subject matter," and thus their "content." *Reed*, 576 U.S. at 163 (citation omitted). The Act targets websites that "allow users to interact socially with each other," § 6-1-1601(4)(a)(IV), but not websites where users interact for other reasons, like education or business. *See Yost*, 778 F. Supp. 3d at 953; *Reyes*, 748 F. Supp. 3d at 1121. The Act also outright exempts a litany of the State's favored entities based on the content they feature across over 15 separate categories, including "[n]ews, sports, entertainment," "interactive gaming," "professional networking," and "[a]cademic or scholarly research" websites. § 6-1-1601(4)(b). Consequently, such websites do not need to shoulder the Act's burdens. "The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation." *Paxton*, 747 F. Supp. 3d at 1032; *see Griffin*, 2025 WL 978607, at *9; *Yost*, 778 F. Supp. 3d at

957-58; *Carr*, 2025 WL 1768621, at *10-11.

"[I]f a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute." *Bonta*, 770 F. Supp. 3d at 1191; *see Reyes*, 748 F. Supp. 3d at 1120.

B.     **The Act's warning notification requirement fails strict scrutiny and any other form of heightened scrutiny.**

Under strict scrutiny, Defendant cannot demonstrate that Colorado has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Assuming for the sake of argument that commercial speech intermediate scrutiny applied, Defendant cannot demonstrate that "the speech restriction directly and materially advanc[es] the asserted governmental interest," and "is not more extensive than necessary to serve the interests that support it." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555-56 (2001) (citation omitted). In any event, the compelled speech is "unjustified [and] unduly burdensome." *NIFLA*, 585 U.S. at 778.

1.     **The State lacks a sufficient governmental interest in compelling covered websites to disseminate speech designed to deter their users.**

Colorado lacks a sufficient governmental interest in compelling covered websites to publish information to minor users deterring them from using the websites' services. To satisfy First Amendment scrutiny, Colorado must "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up); *see Reilly*, 533 U.S. at 555 ("a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real"). And the problem must be in need of a *governmental* solution, as compared to a *private* one.

Although "a State possesses legitimate power to protect children," *Brown*, 564 U.S. at 794; it may not "protect the young from ideas or images that a legislative body thinks unsuitable," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975). Nor may the government compel

websites to adopt its preferred message "in supposed pursuit of better expressive balance." *Moody*, 603 U.S. at 734.

Here, the government does not have a sufficient interest in forcing websites to disseminate information to their users about the use of social media when many private sources are already available to achieve the same end. Many covered websites already publish information about online use, mental health, and wellbeing. *See supra* p.3. Parents and their children also have many tools available to ensure that minor children are responsibly using the internet. *See supra* pp.3-4. Those are precisely the kinds of private parental tools that the Supreme Court has endorsed over governmental intervention. *See, e.g.*, *Playboy*, 529 U.S. at 826. And third-party private sources are often better positioned to provide families with information about multiple types of services.

### 2. The Act's warning notification is unduly burdensome, and is otherwise not properly tailored.

Regardless of the level of First Amendment scrutiny that applies, the Act's compelled-speech requirements are "unduly burdensome." *NIFLA*, 585 U.S. at 778. Both of the Act's compelled-speech options threaten to "drown[] out" the speech that covered websites otherwise present to users. *Id.* Sections 6-1-1601(1)(a) and 6-1-1601(5)(a) require websites to display highly detailed information opining on highly controversial and complicated research—and then to repeat that information at some kind of regular "interval[]." And § 6-1-1601(1)(b) requires a "pop-up" or "full screen notification" every thirty minutes. Both of these options would substantially interfere with covered websites dissemination of "curate[d] . . . feeds." *Moody*, 603 U.S. at 711.

Regardless, the Act's speech regulations are not the "least restrictive means" of pursuing any governmental interest. *AFP*, 594 U.S. at 607 (citation omitted).

Forcing websites to publish warning notifications is not the "least restrictive" way for the State to provide information to minors. *AFP*, 594 U.S. at 607 (citation omitted). In any event, it is

"more extensive than necessary to serve the [asserted governmental] interests." *Reilly*, 533 U.S. at 556 (citation omitted). One obvious alternative is for Colorado itself to engage in governmental speech by providing information to minors about social media use and giving "parents the information needed to engage in active supervision" over children's internet use. *Playboy*, 529 U.S. at 826; *accord Bonta*, 113 F.4th at 1121; *Yost*, 778 F. Supp. 3d 956-57; *Reyes*, 748 F. Supp. 3d at 1127. In fact, Section 2 of the Act does just that. Colorado could go a step further and require schools and other government entities to provide digital literacy instruction to K-12 students about technology and social media use. *See, e.g.*, ExcelinEd, State Approaches to Digital Literacy Instruction (Feb. 2024), https://perma.cc/W94F-TYYE. Colorado could also incentivize third parties to provide more information to families. *See Reyes*, 748 F. Supp. 3d at 1127.

Furthermore, members' self-regulation is extensive, as covered websites already engage in content moderation of harmful speech, provide parental controls and other tools, and provide information to minor users and their parents about responsible and safe use of social media. *See supra* pp.4-5; *Paxton*, 747 F. Supp. 3d at 1037. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention. *Brown*, 564 U.S. at 803.

In any event, the Act is also "either underinclusive or overinclusive, or both." *Yost*, 778 F. Supp. 3d at 957; *see Brown*, 564 U.S. at 805.

The Act is overinclusive in at least three ways. First, it does not purport to identify websites that are harmful to minors or even likely to be accessed by minors. Rather, it targets websites that disseminate a broad range of protected speech. *See, e.g.*, *Reyes*, 748 F. Supp. 3d at 1129. Second, it requires warning notifications for large swaths of valuable, protected, and entirely innocuous speech. For example, it would require warning notifications for a 17-year old watching lectures on YouTube for more than an hour, or a 16-year old marking herself safe from a natural disaster on

Facebook in the middle of the night. Third, it requires warning notifications for *all* covered web-sites, although much of the literature on social media concerns only a handful of services.

The Act is also "seriously underinclusive." *Brown*, 564 U.S. at 805. The Act's central definition and its many exclusions create enormous gaps in the State's regulatory regime. *See Sorrell*, 564 U.S. at 573 (regulation requires a "coherent policy"); *Griffin*, 2025 WL 978607, at *11-12; *Reyes*, 748 F. Supp. 3d at 1128; *Paxton*, 747 F. Supp. 3d at 1037-38. Glaringly, the Act's regulatory regime entirely excludes websites that would otherwise meet the Act's "social media platform" definition, but have 100,000 or fewer "active users in Colorado." § 6-1-1601(4)(a)(I); *e.g.*, Murphy Decl. ¶ 60. In addition, the Act does not apply to a 17-year old spending multiple hours on gaming websites or staying up until 3:00 a.m. streaming shows on Hulu. Finally, it is not clear why the Act would only compel speech with minors as an audience. Ostensibly, parents and other adults could benefit from "information" about "impact of social media." § 6-1-1601(2).

Research also shows that disclosures like can be ineffective. Because of the "the accumulation problem," consumers today "confront so many disclosures daily . . . that they could not attend to (much less master) more than a few [disclosures] even if they wanted to." Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harvard Law School Forum on Corporate Governance (May 6, 2014), https://perma.cc/WXG8-BB4W.

## II.    NetChoice is likely to succeed on its claim that the Act's compelled-speech requirements and central coverage definition are unconstitutionally vague.

Section 4 is also invalid because it is unconstitutionally vague in at least two ways. The central "social media platform" coverage definition is vague. § 6-1-1601(4). And the Act's operative compelled-speech requirements are vague. § 6-1-1601(1)-(3).

Laws must "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). In the First Amendment context, a facial vagueness

challenge "is available" when a law "reaches a substantial amount of constitutionally protected conduct." *Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005) (citation omitted). The concern is that "a vague statute may be functionally overbroad" such that "it causes affected persons to act as though the statutory language had the broadest possible meaning." *Id.*

The Act's coverage definition is vague because it turns on a website's "predominant or exclusive function." § 6-1-1601(4)(b). *Griffin* enjoined as vague a law relying on similar terms. 2025 WL 978607, at *15-16 (explaining that the law failed to define "primary purpose"). Here too, "predominant or exclusive function" is undefined, yet the phrase is "critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2025 WL 978607, at *15; *see* Blumenfeld Decl. ¶ 36. For example, many people use LinkedIn for "professional networking," § 6-1-1601(4)(b)(XIV), but some might use it to "interact socially" with others, § 6-1-1601(4)(a)(IV). The Act's coverage also turns on whether a website permits use of the website "for the purpose of" allowing the creation, sharing, and viewing of user-generated content. § 6-1-1601(4)(a)(II). The Act "is ambiguous as to *whose* . . . 'purpose' is being considered—the user in creating the account or the company in making the forum available." *Griffin*, 2025 WL 978607, at *16.

Even if the Act's coverage were clear (it is not), the Act's operative warning notification provisions are independently vague. § 6-1-1601(1)-(3). The Act's operative warning notification provisions neither define what "function" covered websites must "establish" nor fully explain the content those warnings must contain when displayed. § 6-1-1601(1). Nor do they explain what sort of "pop-up or full screen notification" must be displayed. § 6-1-1601(1)-(2). Importantly, as explained above at pp.6-7, the Act is vague as to whether the second option to display a "pop-up or full screen notification," § 6-1-1601(1)(b), requires covered websites to provide minor users information about "the impact of social media," § 6-1-1601(2)—or just information about time or

length of use. *See* Cleland Decl. ¶ 28; Blumenfeld Decl. ¶ 41.a. These undefined requirements leave websites guessing as to what much state-compelled information they must display to users.

## III.    NetChoice meets all the remaining factors for a preliminary injunction.

"In the First Amendment context, the likelihood of success on the merits will often be the determinative factor." *Verlo*, 820 F.3d at 1126 (cleaned up).

The Act will cause NetChoice members irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Preventing First Amendment harms is so important that "most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (citation omitted). The risk of incurring civil penalties of $20,000 per violation magnifies the harms. *See supra* p.7. Without the injunction, members would be forced to choose between complying—sacrificing First Amendment freedoms—or risk incurring substantial penalties. *See Chamber of Com. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010). The Act also imposes compliance costs "with no guarantee of . . . recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021); *see Ohio v. EPA*, 603 U.S. 279, 292 (2024); *see* Blumenfeld Decl. ¶ 41.d; Geary Decl. ¶ 10; Murphy Decl. ¶ 66.

The remaining two factors, which also favor NetChoice here, "merge" when "the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citation omitted). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132 (citation omitted).

## Conclusion

Plaintiff requests that this Court enjoin Defendant from enforcing Section 4 of the Act, § 6-1-1601, against NetChoice's members before it takes effect on January 1, 2026.

Dated: August 21, 2025

Respectfully submitted,

*/s/ Jeremy Evan Maltz*

Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
  Suite 700
Washington, DC 20001
(512) 693-8350
jeremy@lkcfirm.com

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

*Attorneys for Plaintiff NetChoice*