## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLORADO

NETCHOICE,

*Plaintiff*,

v.

PHILIP J. WEISER, in his official capacity as Attorney General of Colorado,

*Defendant*.

Civil Action No. _____

### DECLARATION OF BARTLETT CLELAND IN SUPPORT OF
### PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION

I, Bartlett Cleland, declare as follows:

1. I am the General Counsel and Director of Strategic Initiatives of Plaintiff NetChoice. As such, I draft and deliver legislative testimony, regulatory comments, and position papers in support of NetChoice's objectives, as well as represent NetChoice in public forums, at industry events, and in meetings with government officials and agencies. My role at NetChoice and my previous experience—which includes being a known thought leader, writer, and speaker on all issues of innovation, communications, and technology, having spent twenty-six years in the technology and innovation public policy space—has also made me familiar with NetChoice members and other websites, applications, and digital services more broadly.[1]

2. I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

I.  **About NetChoice.**

3. NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.

---

[1] This Declaration will refer to all digital services regulated by Colorado House Bill 24-1136 as "covered *websites*" unless necessary to distinguish among different kinds of digital services. Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

[2] NetChoice, Home, https://netchoice.org.

1

4.  For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses, to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services, including: Airbnb, Alibaba.com, Amazon, AOL, Automattic, Discord, Dreamwidth, Duolingo, Earnin, eBay, Etsy, Expedia, Fluid Truck, Google, Hims & Hers, HomeAway, Hotels.com, Lyft, Meta, Netflix, Nextdoor, OfferUp, OpenAI, Orbitz, PayPal, Pindrop, Pinterest, PrizePicks, Reddit, Snap Inc., StubHub, Swimply, Travel Tech, Travelocity, Trivago, Turo, X (formerly known as Twitter), VRBO, Waymo, Wing, Yahoo!, and YouTube. *See* NetChoice, About Us, https://netchoice.org/about/#association-members.

5.  NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that Colorado House Bill 24-1136 (2024) ("Act"), should it take effect and be enforceable, would irreparably harm our members and those who interact with members' websites.

II. **NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.**

6.  NetChoice members' websites publish, disseminate, display, compile, create, curate, and distribute a wide range of valuable and protected expression to their users. They disseminate content (text, audio, graphics, and video) that facilitates their users' ability to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, learn new skills, and simply interact.

7. Because covered websites disseminate such a broad array of protected speech, users employ the covered websites to communicate in a wide variety of ways:

- **Socially.** At its core, the Act singles out websites that disseminate and facilitate user-created speech by "[e]nabl[ing] one or more users to create or post content that can be viewed by other users of the medium" and "[i]nclud[ing] a substantial function to allow users to interact socially with each other within the service or application." Colo. Rev. Stat. §§ 6-1-1601(1), (4)(a)(III)-(IV). Thus, covered members allow their users to connect with friends from school and church, form groups, and find communities of those with likeminded interests—as just a few examples.

- **Demonstratively.** Covered members allow their users to showcase their creative, artistic, and athletic talents to audiences of their choosing—ranging from users' closest friends to the websites' broader community of potential billions. Examples abound. Websites disseminate users' artistic works, such as paintings or student films. They disseminate creative writing or citizen journalism. And they disseminate athletic highlights from high school athletes.

- **Informatively.** Covered members can be one valuable source of news for their users. Users can access everything from front-page news from the Nation's oldest journalistic institutions to student journalism relevant to their local school.

- **Politically.** Covered members also disseminate political speech, allowing their users to participate in public discussion or raise awareness about social causes. Public officials, thought leaders, and citizen activists all use members' services to spread their messages and interact with the public.

3

- **Educationally.** Covered members disseminate a vast amount of educational material. For instance, university professors can upload lectures on everything from accounting to oceanography. Creators upload step-by-step help guides to solve math problems or change tires.

8. In addition to all of those opportunities (and more), NetChoice member websites offer their users the ability to participate in different communities. On Facebook, users can create communities with other like-minded users for many purposes, including by taking part in religious services. On Instagram, users can share vacation pictures and short informative videos. On Nextdoor, users can connect with their neighbors, including by sharing local news and requesting to borrow tools. On Pinterest, users can discover ideas for recipes, style, home decor, motivation, and more. On Reddit, users can create and lead their own communities, on all manner of subjects. Snapchat enables users to have conversations with friends and family in authentic ways that replicate real-life interactions. On Threads, people can share ideas, ask questions, and post random thoughts. On Tumblr, users can engage in microblogging with an emphasis on multimedia. On X, users can engage with their elected representatives and the political, cultural, and social topics of the day. And on YouTube, users can watch documentaries, in addition to all manner of educational, informative, and entertaining content.

### III. NetChoice members provide families with resources and information about use of their services.

9. NetChoice members provide a variety of resources and information to help families draw informed conclusions about how to responsibly and safely use social media.

10. Some of those resources provided by Meta, Snap Inc., and YouTube are publicly available, and detailed in their declarations. *See, e.g.*, Blumenfeld Decl. ¶¶ 10, 22 (YouTube); Geary Decl. ¶¶ 8-9 (Snap Inc.); Murphy Decl. ¶¶ 55-57 (Meta).

4

11. Nextdoor "has participated in a number of research studies that examine community connections across the globe" and provides access on its website to those research studies covering topics such as "[p]romoting online civility," "[i]nclusive moderation," and "[d]isrupting racial bias." Nextdoor, Research in the Neighborhood, https://perma.cc/D7Y5-VDLW.

12. Pinterest's Help Center provides resources and information to parents about their teen's use of Pinterest and social media generally. Pinterest, Help Center: Resources for Parents and Caregivers of Teens, https://perma.cc/K73B-WAZG ("Pinterest"). Pinterest notes that "[t]hrough expert research, we've found that spending time on Pinterest improves young people's emotional wellbeing," and links to a study conducted with University of California Berkley on "the power of inspirational content." Pinterest, *supra*; Pinterest Business, A Feed that Actually Feeds Your Soul? It's Possible, https://perma.cc/5EC5-URUU. Likewise, Pinterest provides a link to #HalfTheStory, Pinterest, *supra*, which is a nonprofit whose "mission is to rebuild the next generation's relationship with technology, and it starts with unpacking the toll it takes on our mental health," #HalfTheStory, Our Story, https://perma.cc/4Q6Q-GPYN. Additionally, Pinterest is the founding signatory of the Inspired Internet Pledge, which "is a commitment by all who work within the digital ecosystem to unite with the common goal of making the internet a safer and healthier place for everyone, especially young people." The Inspired Internet Pledge, Home, https://perma.cc/UM4E-U4AK. Pinterest helped created the Inspired Internet Pledge in coordination with Boston Children's Digital Wellness Lab. *Id.*; The Inspired Internet Pledge, *The Digital Wellness Lab*, https://perma.cc/Q6XV-39MJ.

### IV. NetChoice members go to great lengths to protect minors, and parents have other tools to protect their children online.

13. NetChoice members take the safety of all users seriously and place a special emphasis on minors' safety. Members make a variety of these policies and guides publicly available online for parents and caregivers to freely access.

　　a.　**Limiting access by age.** All NetChoice members prohibit minors younger than 13 from creating accounts on their main services and the services that are regulated by the Act.

　　b.　**Minor-Specific Policies.** Some NetChoice members have policies or practices specifically for minors' accounts on their websites. Instagram, for instance, states that it has "Instagram Teen Accounts . . . that are automatically set to more protective teen safety settings" for minor teenagers. *See* Instagram, About Instagram Teen Accounts, https://tinyurl.com/rxf7cdz4. Similarly, YouTube publicizes that it has multiple "features to support teen wellbeing," such as "[r]eminders that tell . . . teens to take a break," bedtime reminders, auto-play being disabled by default, and limitations on the "recommendation of selected types of content that can be problematic if viewed in repetition." YouTube, Choices for Every Family, https://perma.cc/72QH-3NLU.[3]

　　c.　**General Content-Moderation Policies.** Any minor-specific policies exist alongside the websites' generally applicable "content-moderation" policies. NetChoice members have chosen to balance disseminating large amounts of user-authored expression while also limiting publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities. NetChoice members publish and enforce varied content-moderation policies that address the publication of such prohibited content—including content that promotes or glorifies suicide, self-harm, eating disorders, substance abuse, stalking, bullying, harassment,

---

[3] This Declaration cites portions of NetChoice members' policies. Those policies are lengthy and nuanced (and otherwise publicly available), so this Declaration does not purport to fully summarize the policies.

6

grooming, trafficking, child pornography, sexual exploitation, abuse, or content that is sexually explicit or pornographic. Based on NetChoice's research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://perma.cc/Z4RS-KL5W. Members' content moderation affects both what is available on the website to those looking for it (*e.g.*, through search) *and* what shows up in users' feeds or on users' homepages.

14. Parents and guardians have many overlapping and complementary choices to oversee and control their minor children's use of the Internet, including controlling whether their minor children have access to Internet-connected devices in the first place. There are sources that collect many of these resources, providing parents with a wealth of useful information in one place. *See, e.g.*, Internet Matters, Parental Controls Guides, https://perma.cc/H79P-66AR (collecting guides to parental controls for, *e.g.*, mobile devices, gaming devices, browsers, operating systems, and social media services).

a. **Network-Level Restrictions.** Many, if not most, cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access altogether; to block certain apps, sites, and contacts from their children's phones; and to restrict screen time on their children's devices. *See, e.g.*, Internet Matters, Parental Control Guides, *supra* (collecting parental-control guides for "broadband & mobile networks"); Verizon, Verizon Family, https://perma.cc/35F8-JQ8A; AT&T, Secure Family, https://perma.cc/QE5G-W384; T-Mobile Privacy Center, Family Controls and Privacy, https://perma.cc/JN8Q-H633; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/4F2E-J38Q. Similarly, there is much publicly accessible information about the many wireless routers that offer parental control settings

7

parents can use to block specific online services, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services their children visit. *See, e.g.*, Netgear, Circle - Smart Parental Controls, https://perma.cc/Y54Z-QP2C; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/YDM6-VNZK.

      b.      **Device-Level Restrictions.** Many devices themselves contain ways parents can restrict their use. *See* Internet Matters, Parental Control Guides, *supra* (collecting parental-control guides for "devices"). Many of the most popular mobile phone and tablet manufacturers like Apple, Google, Microsoft, and Samsung publicize the ways they allow parents to limit screen time across their devices and provide parents with tools to control what applications their children can use, to set age-related restrictions on those applications, to filter content, and to control privacy settings. *See, e.g.*, Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/YFD4-AHZD; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/AH7X-NUMS; Microsoft Support, Set up Microsoft Family Safety, https://tinyurl.com/mr29ed6w; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/CXK5-9QFY. There are also many third-party applications parents can install on their children's devices to monitor their activity, set limits on screen time, and filter content—as publicized in mainstream publications. *See, e.g.,* Alyson Behr, *The Best Parental Control Apps in 2025, Tested by Our Editors*, CNN underscored (Jan. 2, 2025), https://perma.cc/ETL2-EZED.

      c.      **Browser-Level Restrictions.** There are also parental controls on Internet browsers that allow parents to control what online services their children may access. *See, e.g.*, Internet Matters, Parental Control Guides, *supra* (collecting parental-control guides for browsers); Mozilla Support, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/Y2G5-NMV9. Some browsers offer a "kids mode" or allow parents to see what online services their

8

children are accessing the most. *See* Google Safety Center, Parental Controls, https://perma.cc/MVM7-EEAT; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://tinyurl.com/yc4xzmx5. Third-party software and browser extensions are also widely available to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://perma.cc/89FM-7Q4B. Browsers also provide all users with "some control over the information websites collect." FTC, How Websites and Apps Collect and Use Your Information, https://perma.cc/4SRH-R7F6.

        d.        **App-Level Restrictions.** NetChoice members have developed their own tools that allow parents to set further restrictions on their minor children's use of the websites. Information about these tools is publicly available to parents. *See* Internet Matters, Parental Control Guides (collecting parental-control guides for "social media" and "entertainment and search engines"); *see* Blumenfeld Decl. ¶ 17-27 (YouTube); Geary Decl. ¶ 7 (Snap Inc.); Murphy Decl. ¶¶ 32-40 (Meta). For example, Pinterest is "running an experiment" on reminders during the school day that remind minor users that "open[] the Pinterest app during the school day" to "put Pinterest down, pause notifications, and focus on school." Pinterest, *supra*.

**V.    The Act's effect on NetChoice members and the Internet.**

        15.        According to the Act's definitions, the Act compels speech from several services operated by NetChoice's member companies.

        16.        Under the Act, a regulated "social media platform" is any "internet-based service, website, or application that" meets four requirements:

> (I) Has more than one hundred thousand active users in Colorado;
> (II) Permits a person to become a registered user, establish an account, or create a public or semi-public profile for the purpose of allowing users to create, share, and view user-generated content through the account or profile;
> (III) Enables one or more users to create or post content that can be viewed by other users of the medium; and

9

>> (IV) Includes a substantial function to allow users to interact socially with each other within the service or application. . . .

Colo. Rev. Stat. § 6-1-1601(4)(a).

17. Because they meet that definition, the Act regulates services operated by NetChoice members, including: (1) Automattic (Tumblr); (2) Meta, which owns and operates Facebook, Instagram, and Threads; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.

18. Each of these identified services has the features identified in § 6-1-1601(4)(a) and does not otherwise qualify for an exception.

19. Each of these identified services has at least 100,000 active users in Colorado.

20. Each covered NetChoice member requires people to create an account to access some or all of the protected speech and speech-facilitating functions on the services.

21. Each of these identified services allows its account holders to upload and publicly post content (whether to all other users or to specified groups of account holders). Other account holders may then view that content and react to it, comment on it, or share it with others.

22. Each of these identified services permits its account holders to engage in a wide variety of protected speech activities, subject to each website's unique content moderation policy.

23. Covered NetChoice members' users access the covered websites to engage in protected speech activities, including speaking to others and viewing content created by others.

24. In other words, each covered NetChoice member's website is what is commonly referred to as a "social media" website.

25. Conversely, under the Act's definitions, a wide variety of other kinds of websites are *not* regulated by the Act, including: (1) internet home pages; (2) search engines; (3) educational websites; (4) online shopping; (5) generative AI; (6) news and sports websites;

10

(7) streaming services; (8) banking services; (9) professional networking websites; (10) general information websites; (11) online gaming; (12) email and direct messaging; and (13) other "social media" websites that do not meet the user threshold, among others.

26.  I understand that "[o]n or after January 1, 2026, a social media platform must establish a function that" requires covered websites to provide one of two State-mandated messages. *Id.* § 6-1-1601(1). Both of these messages would compel speech from NetChoice members.

27.  First, under § 6-1-1601(1)(a), covered websites can "provide users who are under the age of eighteen with information about their engagement in social media that helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users." *Id.* § 6-1-1601(1)(a), (2). I understand that § 6-1-1601(1)(a) compels covered websites to opine on the highly controversial topic of "the impact of social media" on "mental and physical health" of minors, which is the subject of active scholarly and social debate, as well as active litigation. *Id.* § 6-1-1601(1)(a), (2). Colorado limits the "information" that covered websites can use to form its state-compelled opinion: "The information must be supported by data from peer-reviewed scholarly articles or the sources included in the mental health and technology resource bank established" and maintained by the Colorado Department of Education, pursuant to Section 2 of the Act. *Id.* § 6-1-1601(2); *see id.* § 22-2-127.8. I also understand that the Act does not allow covered websites to freely make decisions about the content and form of the warnings they provide. The Act requires Colorado officials to "establish standards" for "notifications" that "meet[] the [Act's] requirements." *Id.* § 6-1-1601(5). The standards must: (a) "Recommend intervals for notification frequency"; (b) "Provide sample messaging for the content of the notification"; (c) "Be informed by data and research on the efficacy of notifications"; and (d) "Recommend the age range of users who would most benefit from notifications." *Id.* And, the Act

additionally requires that any notification provided under § 6-1-1601(1)(a) be "informed by the[se] standards." *Id.* § 6-1-1601(1)(a).

28.  Second, under § 6-1-1601(1)(b), covered websites can alternatively "[d]isplay[ ] a pop-up or full screen notification to a user who attests to being under the age of eighteen when the user: (I) Has spent one cumulative hour on the social media platform during a twenty-four-hour period; or (II) Is on a social media platform between the hours of 10 p.m. and 6 a.m." *Id.* § 6-1-1601(1)(b). This timing-based warning "must repeat at least every thirty minutes after the initial notification." *Id.* § 6-1-1601(3). The Act is otherwise vague as to what content a covered website must include in the alternative timing-based warning notification under § 6-1-1601(1)(b). I understand that one possibility is that the alternative timing-based notification must provide the same information required by the first option: "information about [users'] engagement in social media that helps [them] understand the impact of social media on the developing brain, and the mental and physical health of users." *Id.* § 6-1-1601(2). That is because the Act provides that: "The function established pursuant to subsection (1) of this section"—which includes the timing-based warning in § 6-1-1601(1)(b)—"must provide users [under 18] with information about their engagement." *Id.* But the Act also states that a function established under (1)(a)—but *not* (1)(b)—must "be informed by the standards established in subsection (5)." *Id.* § 6-1-1601(1)(a). So the alternative, timing-based notification may require the covered website to display *only* information about how long the user has been using the service or the time at which the user is using the service. *See id.* § 6-1-1601(b)(I)-(II); § 6-1-1601(3) ("If the social media platform establishes the function described in subsection (1)(b) of this section . . . .").

29.  NetChoice members would be irreparably harmed if they were required to comply with the Act's compelled-speech requirements.

12

\*   \*   \*

30.     If Defendant is allowed to enforce the Act when it takes effect on January 1, 2026, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on August 13, 2025, in WASHINGTON, D.C.

_____
Bartlett Cleland