**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 25-cv-2538-WJM-KAS

NETCHOICE,

     Plaintiff,

v.

PHILIP J. WEISER, in his official capacity as
Attorney General of Colorado,

     Defendant.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

This case presents the following question: Can Colorado constitutionally compel social media companies, likely engaged in expressive speech, to provide non-commercial disclosures to minors about the alleged health impacts of using their platforms?

Plaintiff NetChoice, an internet trade association that represents many of the most prominent social media giants in the world, submits that the answer to this question is no under the First Amendment and the Fourteenth Amendment's Due Process Clause. (*See generally* ECF No. 15.) Accordingly, it asks the Court to enter a preliminary injunction ("Motion") enjoining Section 4 of Colorado House Bill 24-1136, § 6-1-1601, C.R.S. (2026) ("Section 4" or "the Act"), from going into effect on January 1, 2026. (*Id.*)

Defendant Philip J. Weiser, in his official capacity as Attorney General of

Colorado, counters that the answer to the question presented is yes.  (*See generally*

ECF No. 23.)  In his view, Section 4 of the Act merely requires social media companies,

which he says engage in commercial speech, to provide minors with factual, non-

controversial information about the risks of social media use.  (*Id.* at 8.)  As such,

Weiser argues that Section 4 is not likely to offend the First and Fourteenth

Amendments and should therefore be permitted to go into effect early next year.  (*See

generally id.*)

The Court fully appreciates Colorado's legitimate effort to protect the children and

adolescents of our state from the impacts of social media use on their health and well-

being.  The Court concludes, however, that it is substantially likely NetChoice will

succeed on the merits of its claims that Colorado may not pursue this laudable goal by

compelling social media companies to speak its expressive messages.  Or to put it in

more precise legal terms, the Court concludes that NetChoice is likely to show that

Section 4 of the Act fails to satisfy the demanding strict scrutiny standard prescribed by

the First Amendment.  Consequently, the Court grants NetChoice's motion for a

preliminary injunction.

## I.    THE ACT

The following statutory background is drawn from the parties' briefing on the

Motion.  (ECF Nos. 15, 23, 24.)[1]

In 2024, the General Assembly "declare[d] that it is a matter of statewide concern

to provide research-based education and interventions" "on the effects of social media

---

[1] All citations to docketed materials are to the page number in the CM/ECF header,
which sometimes differs from a document's internal pagination.

use on" youth brain development.  H.B. 24-1136 § 1(2).  To this end, much of the Act is aimed at creating educational resources for Colorado students, parents, and educators. *Id.* §§ 2, 3.  For instance, the Act directs the Colorado Department of Education to convene a stakeholder group of educators, school mental health professionals, parents, youths, technology experts, and "a representative from a technology industry association, or a technology engineer."  § 22-2-127.8(1)(c).  This group is to build a "resource bank" consisting of "evidence-based, research-based scholarly articles and promising program materials and curricula pertaining to the mental and physical health impacts of social media use by youth, internet safety, and cybersecurity."  § 22-2-127.8(1)(a).

But the Act is not merely aimed towards educating Coloradans on the impacts of social media use—it promulgates a regulatory scheme as well.  *See* 24-1136 § 1(2) (declaring its aim of providing "education" *and* "interventions").  Part 16 of Section 4 of the Act, titled "Protections For Youth Using Social Media," is the primary subject of this lawsuit.  Section 4 regulates "[s]ocial media platform[s]," which it defines as "an internet-based service, website, or application that":

> (I) Has more than one hundred thousand active users in Colorado;
>
> (II) Permits a person to become a registered user, establish an account, or create a public or semi-public profile for the purpose of allowing users to create, share, and view user-generated content through the account or profile;
>
> (III) Enables one or more users to create or post content that can be viewed by other users of the medium; and
>
> (IV) Includes a substantial function to allow users to interact socially with each other within the service or application.

§ 6-1-1601(4)(a).

The Act excludes several internet-based services and applications from its coverage definition, including those with the following "predominant or exclusive function[s]": "electronic mail"; "commercial transactions" for "online shopping or e-commerce"; "teleconferencing and video conferencing"; "crowd-sourced content for reference guides," "such as encyclopedias and dictionaries"; "cloud-based electronic services"; "news, sports, [and] entertainment"; "reference guides such as encyclopedias and dictionaries"; "interactive gaming"; "virtual gaming"; "businesses, products, or travel information"; "communication within a business"; "enterprise software"; "streaming service[s]"; "technical support"; "career development opportunities"; "academic or scholarly research"; and "news information for a mass medium." § 6-6-1601(4)(b). The Act also excludes websites "under the direction of an educational entity." *Id.*

Social media platforms covered by the Act are required to "establish a function" that provides minor users with certain information. § 6-1-1601(1). The function must satisfy two criteria: First, it must "provide users who are under the age of eighteen with information about their engagement in social media that helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users," and second, the information must "be supported by data from peer-reviewed scholarly articles or the sources included in the mental health and technology resource bank established" by the Act. § 6-1-1601(2).

Within these parameters, social media platforms have two ways of complying with the Act's mandate that they "establish a function." § 6-1-1601(1). First, a platform may develop its own function, so long as it meets the criteria listed in section 6-1-

4

1601(2).  § 6-1-1601(1)(a).  That is, the self-developed function must be "informed" by standards established by Colorado's chief information officer.  *Id.*; *see also* § 6-1-1601(5).  These standards shall (a) "recommend intervals for notification frequency," (b) "provide sample messaging for the content of the notification," (c) "be informed by data and research on the efficacy of notifications;" and (d) "recommend the age range of users who would most benefit from notifications."  § 6-1-1601(5).  As of the date of this Order, however, these standards have not been published by Colorado's chief information officer.

Second, social media platforms may opt to use a function that

> [d]isplays a pop-up or full-screen notification to a user who attests to being under the age of eighteen when the user: (I) Has spent one cumulative hour on the social media platform during a twenty-four-hour period; or (II) Is on a social media platform between the hours of ten p.m. and six a.m.

§ 6-1-1601(1)(b).  If a company elects to establish a function in this way, "the function must repeat at least every thirty minutes after the initial notification."  § 6-1-1601(3).  And because subsection (b) falls under section 6-1-1601(1), the pop-up/full-screen notification is not only required to notify minors that they have been using social media for an hour or late at night—the notification must also provide minors with information about their engagement in social media that is backed by scientific data.  *See* § 6-1-1601(2) (requiring "[t]he function established pursuant to subsection (1) of this section" to meet the information requirements).

The Act amends Colorado's consumer protection laws, which are enforceable by the Colorado Attorney General.  § 6-1-103.  The Attorney General may pursue injunctions and civil penalties to enforce the Act.  *See, e.g.*, §§ 6-1-110, 6-1-112.  The

potential civil penalties for violations of the Act include fines up to $20,000 for "each

violation." § 6-1-112(1)(a). Every "consumer or transaction involved" triggers a new

"violation." *Id.*

NetChoice represents the following social media companies that are subject to

the compelled speech requirements of Section 4: Automattic (Tumblr); Meta (Facebook,

Instagram, and Threads); Nextdoor; Pinterest; Snap Inc. (Snapchat); Reddit; X (formerly

Twitter); and YouTube. (ECF No. 15 at 2.) NetChoice brings facial and as-applied

challenges to Section 4 of the Act under the First Amendment and the Fourteenth

Amendment's Due Process Clause. (*Id.* at 7.) NetChoice also contends that Section 4

is unconstitutionally vague.[2] (*Id.* at 23.) The Court benefitted from extensive oral

argument on these issues last month, and the Motion is otherwise fully ripe for

adjudication. (ECF Nos. 23, 24, 27.)

## II.    ANALYSIS

The principal question in this case is whether NetChoice is substantially likely to

show that Section 4 of the Act violates the First Amendment. To answer this question,

the Court begins by setting forth the standard for granting a preliminary injunction. The

Court next addresses Attorney General Weiser's argument that the Motion properly

seeks facial, not as-applied, relief. Agreeing that the Motion should be construed as

seeking facial relief, the Court proceeds to decide which tier of scrutiny is likely to apply

to the speech at issue in this case. Finally, applying strict scrutiny, the Court concludes

that NetChoice is likely to show that Section 4 is not the least restrictive means of

---

[2] Because the Court concludes Section 4 likely violates the First Amendment, it need not
resolve NetChoice's vagueness challenge.

addressing Colorado's compelling interest in protecting the health and well-being of its children and adolescents.

The sum of these parts is this: NetChoice is substantially likely to prevail on its First Amendment challenge to Section 4 of the Act. Accordingly, the Court grants the Motion.

## A. PRELIMINARY INJUNCTION STANDARD

"Because a preliminary injunction is an 'extraordinary remedy never awarded as of right,'. . . the movant must make a 'clear and unequivocal' showing it is entitled to such relief." *Colorado v. U.S. Environmental Protection Agency,* 989 F.3d 874, 883 (10th Cir. 2021) (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24 (2008)). "To obtain a preliminary injunction, the movant must show (1) it 'is substantially likely to succeed on the merits,' (2) it 'will suffer irreparable injury if the injunction is denied,' (3) its 'threatened injury outweighs the injury the opposing party will suffer under the injunction,' and (4) 'the injunction would not be adverse to the public interest.'" *Id.* (quoting *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017)). The third and fourth factors merge where, as here, the state is the opposing party. *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1278 (10th Cir. 2022).

Weiser asserts in his response that, "[i]f the Court determines that NetChoice is likely to succeed on the merits of its claims, the Attorney General concedes that the remaining preliminary injunction factors weigh in favor of an injunction." (ECF No. 23 at 25 n.8.) The Court therefore focuses only on the first factor of the preliminary injunction analysis: Whether NetChoice is substantially likely to succeed on the merits.

## B.  THE MOTION PROPERLY PURSUES FACIAL RELIEF

At the outset, the Court adopts Weiser's position that "the Court should assess NetChoice's claim as one for facial relief."  (ECF No. 23 at 5.)  Where a party asserts an as-applied challenge, a court "tests the application of [a law] to the facts of a plaintiff's concrete case."  *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1248 (10th Cir. 2023) (quotations omitted).  Here, however, NetChoice challenges Section 4 before the statute has ever been applied to its members (or any other social media platform).  Indeed, the statute does not go into effect until January 1, 2026, so the Court has no facts before it demonstrating how Section 4 applies to each of NetChoice's members.  As such, there is no "concrete case" against which the Court can apply the constitutional test.  *Id.*  The Court accordingly proceeds to consider whether Section 4 is unconstitutional on its face.

"For a host of good reasons, courts usually handle constitutional claims case by case, not *en masse*."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  The United States Supreme Court "has therefore made facial challenges hard to win."  *Id.*  In a typical facial challenge, "a plaintiff cannot succeed unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'"  *Id.* (alterations in original) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987), and then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

But the Supreme Court has relaxed this difficult standard in the First Amendment context.  "To provide breathing room for free expression," the Court has "substituted a less demanding though still rigorous standard," which asks whether a "law's

8

unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 723; *see also Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021) (considering whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep").  If a challenger shows that this standard is satisfied, a court may sustain a facial challenge to the law and strike it down.  *Moody*, 603 U.S. at 723.  *Moody* prescribes a two-step analysis for resolving First Amendment facial challenges: First, the court must "assess the state laws' scope," and second, the court must "decide which of the laws' applications violate the First Amendment, and . . . measure them against the rest."  *Id.* at 725.

Applying these principles, the Court concludes that NetChoice's facial challenge is compatible with the analysis enunciated in *Moody*.  This is because Section 4's scope and application are uniform in all material respects, irrespective of the regulated social media platforms' specific attributes or content-moderation practices.  As mentioned, all social media platforms covered by Section 4 are required to "establish a function," § 6-1-1601(1), which must (1) "provide [minor] users . . . with information about their engagement in social media that helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users," and (2) the information must be "supported by data from peer-reviewed scholarly articles or the sources included in the mental health and technology resource bank established" by the Act, § 6-1-1601(2).

In other words, regardless of the particular service offered or algorithm employed by a regulated company, Section 4 requires *every* covered social media platform to

perform the same task under the Act: provide minors with data-based information about the impacts of social media use on their mental and physical health.  *Id.*  As the Court will later explain, this obligation to speak Colorado's expressive message likely violates the First Amendment.  Accordingly, to the extent Section 4 offends the First Amendment, it does so in the same material way across all social media platforms subject to the provisions of the Act.  *See Ams. for Prosperity Found.*, 594 U.S. at 618 (granting facial relief where "the pertinent facts . . . are the same across the board").

Weiser does not clearly explain why he believes that facial relief is not available in this case.  (*See* ECF No. 23 (declaring, in conclusory fashion, that "NetChoice cannot carry [its] heavy burden" of satisfying the facial analysis).)[3]  For instance, he does not suggest that Section 4 will require some covered entities to speak, while others may not be so required, depending on the specific circumstances of their respective platforms. (*Id.*)  At most, Weiser points to the flexibility Section 4 gives social media companies to craft the exact verbiage of the mandated disclosures.  (*See id.* at 1 (describing Section 4 as imposing "flexible requirements"); *see also id. at 4* (stressing that the Act "provides countless ways for companies to comply"); *id.* at 14 (emphasizing the "discretion afforded platforms" in crafting their "required disclosures").)

But the flexibility Section 4 affords social media companies to select the exact verbiage in the mandatory disclosures is of no constitutional moment.  The

---

[3] To be sure, Weiser clearly argues his view that *as-applied* relief is unavailable here because "NetChoice's members could adopt dramatically different, but all compliant, approaches" to satisfying Section 4.  (ECF No. 23 at 5.)  But beyond (correctly) articulating the legal standard for analyzing NetChoice's facial challenge, he does not tell the Court why the record does not permit facial relief in these circumstances.  (*See id.* at 6–7 (merely articulating the issue presented without explaining why facial relief is impossible).)

constitutional quandary in this case is that Section 4 requires social media companies,

which are likely engaged in expressive speech (explained below), to speak at all.

Nor does it matter that Colorado's chief information officer has yet to announce

the standards by which regulated entities must develop their functions under section 6-

1-1601(1)(a). Recall that those forthcoming standards will (a) "recommend intervals for

notification frequency," (b) "provide sample messaging for the content of the

notification," (c) "be informed by data and research on the efficacy of notifications;" and

(d) "recommend the age range of users who would most benefit from notifications." § 6-

1-1601(5). But those standards will not bear on whether social media platforms have to

speak in the first place; instead, the standards pertain to details regarding the

disclosures' content and how often they will need to be displayed. Simply put, those

details will not remedy or otherwise ameliorate the constitutional compelled-speech

infirmity at issue here.

*NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024), illustrates why the

admittedly thin record here does not foreclose preliminary facial relief. There, California

enacted a statute "requiring online businesses to create a Data Protection Impact

Assessment (DPIA) report identifying, for each offered online service, product, or

feature likely to be accessed by children, any risk of 'material detriment to children that

arise from the data management practices of the business.'" *Id.* at 1109. California's

statute required covered entities to address eight enumerated factors in preparing the

DPIA reports, and to "create a timed plan to mitigate or eliminate the risk[s]" identified in

a DPIA report "before the online service, product, or feature is accessed by children . . .

." *Id.* The covered entity was then required to "provide a list of all the DPIA reports the

business has completed, or copies of the DPIA reports themselves, to the California

Attorney General upon written request . . . ."  *Id.*

The Ninth Circuit concluded that facial relief was available to NetChoice at the

preliminary injunction stage because "the DPIA report requirement, in every application

to a covered business, raises the same First Amendment issues."  *Id.* at 1116.  The

Circuit explained that "every business covered by the [statute] must create DPIA reports

identifying . . . any risk of 'material detriment to children that arise from the data

management practices of the business.'"  *Id.*  The Circuit then reasoned:

> *Whether it be NetChoice's members or other covered
> businesses providing online services likely to be accessed
> by children, all of them are under the same statutory
> obligation to opine on and mitigate the risk that children may
> be exposed to harmful or potentially harmful content,
> contact, or conduct online.*  While it is certainly possible that
> in some applications, a covered business will ultimately
> conclude that it need not address certain risks in its DPIA
> report because its new service to be offered does not create
> such risks, *see id.* § 1798.99.31(a)(1)(B) (stating that a
> covered business shall address the eight factors 'to the
> extent applicable'), *there is no question that a covered
> business at the threshold would still have to inquire into
> whether the risk exists before it can decline to address it in
> its DPIA report.  Therefore, in every circumstance in which a
> covered business creates a DPIA report for a particular
> service, the business must ask whether the new service may
> lead to children viewing or receiving harmful or potentially
> harmful materials.*  Whether the State can impose such a
> requirement without running afoul of the First Amendment
> may be answered without speculation 'about 'hypothetical' or
> 'imaginary' cases.'  *Wash. State Grange*, 552 U.S. at 450,
> 128 S.Ct. 1184.
>
> Accordingly, unlike the record in the *Moody* case, the record
> here is sufficiently developed to consider the scope of the
> DPIA provision and whether its unconstitutional applications
> substantially outweigh its constitutional ones.  We therefore
> proceed to consider whether the requirement is likely to
> survive NetChoice's First Amendment facial challenge.

*Id.* (emphases added).

A similar logic applies here.  Like the regulated entities at issue in *Bonta*, NetChoice's members—and importantly, all other covered social media platforms—"are under the same statutory obligation to opine on" the impacts of social media use on minors' health.  *Id.*  Further like *Bonta*, online businesses are required to provide reports to third parties: In that case, to the state; here, to minor users themselves.  *Id.*

True, the warnings, like the DPIA reports, may differ in some minor respects as between different social media platforms, such as the language used therein.  *See id.* (acknowledging that the precise content of the DPIA reports may vary in some respects since not every social media platform employs the same data management practices). But to reiterate, the warnings here must all share the same salient hallmark: They must *all* convey to minor users Colorado's belief that excessive use of social media may be risky to their health and well-being  *See X Corp. v. Bonta*, 116 F.4th 888, 898–99 (9th Cir. 2024) (concluding that a facial challenge to a statute requiring social media companies to prepare a "Content Category Report" was "permissible" because the statute's "provisions compel every covered social media company to reveal its . . . opinion about contentious issues"); *see also NetChoice, LLC v. Griffin*, 2025 WL 978607, at *7 (W.D. Ark. Mar. 31, 2025) (concluding that further discovery was not necessary to resolve NetChoice's facial challenge where "the Act imposes a platform-wide burden on users' right to engage in that speech, and the Court struggles to see how this would differ between the platforms regulated").  In this way, Section 4's constitutionality rises and falls invariably across all its applications.

For these reasons, the Court concludes that the limited record here does not

foreclose preliminary facial review of Section 4.  The Court proceeds to perform that review next.

### C.  STRICT SCRUTINY LIKELY APPLIES TO SECTION 4

The parties agree that Section 4's compelled speech requirements implicate the First Amendment but disagree as to what level of scrutiny the Court should apply when examining that claim.  NetChoice argues that strict scrutiny applies because (1) compelled speech laws necessarily trigger strict scrutiny, and (2) "the Act selects websites for compelled speech based on the content of their websites."[4]  (ECF No. 15 at 8.)  Weiser responds that Section 4 "is subject to *[Zauderer v. Office of Disciplinary Counsel of the Supreme Court of* Ohio, 471 U.S. 626 (1985)] scrutiny" because it compels covered platforms to merely "disclose purely factual and uncontroversial information in the context of a commercial transaction."  (ECF No. 23 at 10.)  The Court agrees with NetChoice that strict scrutiny likely applies.

The First Amendment is designed "'to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . .'"  *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)).  In evaluating whether a law violates the First Amendment, courts "'distinguish between content-based and content-neutral regulations of speech.'"  *Vidal v. Elster*, 602 U.S. 286, 292 (2024) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S.

---

[4] The Court concludes that strict scrutiny likely applies because Section 4 likely compels non-commercial speech, so it need not address whether strict scrutiny applies because Section 4's coverage definition is content-based.  The Court notes, however, that Weiser's counsel expressly "concede[d]" at oral argument "that . . . the regulation is a content-based regulation of speech because it requires looking to the content of the function in order to establish whether it qualified with the statutory standard."  (Oral Argument Transcript, p. 49.)

755, 766 (2018)).  A content-based regulation "target[s] speech based on its communicative content," restricting discussion of a subject matter or topic.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  "As a general matter," a content-based regulation is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests."  *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163).  When a state "compel[s] individuals to speak a particular message," the state "alter[s] the content of their speech," and engages in content-based regulation.  *Id.* (cleaned up) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).  The First Amendment's guarantee of freedom of speech makes no distinction of "constitutional significance" "between compelled speech and compelled silence."  *Riley*, 487 U.S. at 796–97.

But laws regulating commercial speech are generally subject to a lesser standard of constitutional scrutiny.  *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563–66 (1980).  Speech is commercial when it "does 'no more than propose a commercial transaction.'"  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)).  Courts have recognized that the "commercial speech 'analysis is fact-driven, due to the inherent 'difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.'"  *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 284 (4th Cir. 2013)).

Therefore, in close cases, courts consider the three factors identified by the

Supreme Court in *Bolger v. Youngs Drug Products Corporation*, to determine if speech is commercial.  *Id.*  "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation."  *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66–67).  The *Bolger* factors are important guideposts, but they are not necessarily dispositive.  463 U.S. at 67 n.14 ("Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial.").

Commercial speech is generally subject to intermediate scrutiny.  *U.S. v. Wenger*, 427 F.3d 840, 846 (10th Cir. 2005).  An exception applies, however, to compelled commercial speech that is "purely factual and uncontroversial."  *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023); *see also Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1074 (9th Cir. 2020) (citing *Zauderer*, 471 U.S. at 651, as a variation in the treatment of speech "within the class of commercial speech"); *Wenger*, 427 F.3d at 849 ("*Zauderer*, therefore, eases the burden of meeting the *Central Hudson* test.").

A disclosure is "purely factual" if it only requires "the disclosure of accurate, factual information."  *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1276.  A statement "is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate."  *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281–82 (5th Cir. 2024) (citations omitted).  "In that scenario, the

government need only demonstrate the compelled speech survives a lesser form of scrutiny akin to a rational basis test." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1266.

For all other commercial speech, courts must apply a form of intermediate scrutiny by asking "whether the asserted governmental interest is substantial," "whether the regulation directly advances the governmental interest asserted," and "whether [the law] is not more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566.

Here, Section 4's compelled disclosures do not constitute commercial speech because they do far more than merely propose a commercial transaction. *See Bolger*, 463 U.S. at 66 (commercial speech is that which does "no more than propose a commercial transaction"); *see also Bonta*, 113 F.4th at 1120 (concluding that the DPIA reports were "disconnected from any economic transaction" and thus not commercial). Indeed, the disclosures compelled by the Act require social media companies to opine on the impacts of social media use on minors' mental and physical health. § 6-1-1601(2). The Court is hard-pressed to conclude that such opinions do not pertain to expressive issues of significant social, political, and scientific concern—and not matters of a commercial character. *See Bonta*, 113 F.4th at 1122 (describing California's DPIA "disclosure regime" as forcing social media platforms to provide "highly subjective opinions about content-related harms to children"); *see also Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1275 (10th Cir. 2000) (instructing courts to consider whether speech is primarily economic and transactional or whether "a significant theological, political, or other noncommercial purpose underlay the subject message," such that it should "be accorded the substantially greater First Amendment protections enjoyed by

'core' religious speech and the other varieties of noncommercial First Amendment speech such as political speech"). As such, the Court concludes Section 4's compelled disclosure requirements are appropriately classified as expressive—and not commercial—speech.

The Court bases this conclusion on its "common sense" understanding of the nature of the compelled disclosures. *See Wenger*, 427 F.3d at 847 (instructing courts to "draw common sense distinctions" between commercial and non-commercial speech). But even if all this presents a closer question than the Court presently apprehends, the *Bolger* factors bolster its conclusion that the compelled disclosures cannot fairly be understood to be commercial speech:

1. The compelled disclosures are plainly not advertisements. *Bolger*, 463 U.S. at 66–67. They are not designed to sell a product or service;

2. Relatedly, the compelled disclosures do not refer to a particular product; rather, they pertain to the alleged impacts of using social media generally on a particular (admittedly vulnerable) segment of our society. *Id.*; and

3. Social media companies have no economic motivation to provide the compelled disclosures. *Id.* On the contrary, social media platforms would presumably have an economic incentive *not* to provide the disclosures, as they would likely *discourage* minors from using their platforms.

Tellingly, Weiser does not attempt to apply the *Bolger* factors, citing the decision only once throughout his response brief. (*See* ECF No. 23 at 9 (citing *Bolger* once but not listing, let alone applying, its factors).)[5] Instead, he focuses not on the

---

[5] When asked at oral argument why he did not cite the *Bolger* factors in his response, Weiser's counsel began to attempt to apply them on the spot, but he pivoted back to the speech

characteristics of the compelled disclosures themselves, but on the speech in which

NetChoice's members ordinarily engage.  (ECF No. 23 at 8.)  According to Weiser, the

Act "regulates commercial speech because the entire relationship between the

regulated platforms and its user is commercial."  (*Id.*)  This is so, he claims, because

"the relationship between a social media company, its users, and its advertisers is

simple: the company provides a service to the user in exchange for capturing that user's

attention and data, which it then monetizes—often to third-party advertisers."  (*Id.* at 10.)

Initially, the Court observes that Weiser's focus on the speech in which

NetChoice's members ordinarily engage is at odds with the position he advanced at oral

argument.  There, the Court initially asked both parties, "What is the speech that is at

issue here?  Is it the social—is it the curated feed [sic][6] from the social media to the

users or is it as the plaintiff has referred to the compelled disclosures that the covered

entity will have to provide?"  (Oral Argument Transcript, p. 48.)  Weiser responded, "It's

the latter, Your Honor.  It's the speech that exists as part of the function that the

companies are required to disclose here."  (*Id.* at 48–49.)  Yet in his response brief,

Weiser appears to base his commercial speech arguments on the speech in which

NetChoice's members ordinarily engage.  (*See generally* ECF No. 23.)

The Court believes that the level of scrutiny is properly determined by analyzing

_____

in which NetChoice's members ordinarily engage.  (*See, e.g.*, Oral Argument Transcript, p. 54
("Let me just start with the first one.  The first one is whether the expression is concededly an
advertisement.  I don't think that there's information in the record today to say one way or
another whether the—*a social media platform's algorithm is an advertisement.*") (emphasis
added).)  The Court thus remains confused as to Weiser's position: In deciding which level of
scrutiny to apply, does he believe the Court should look to the compelled speech itself, or rather
to the speech in which covered entities engage?

[6] The Court is quoting from an unofficial, unedited transcript prepared by the Court
Reporter.

the nature of the compelled speech itself.  *See Bonta*, 113 F.4th at 1122 (applying the *Bolger* factors to the compelled DPIA reports themselves, not the speech NetChoice's members ordinarily engage in); s*ee also X Corp.*, 116 F.4th at 903 ("For these reasons, we conclude that the Content Category Report provisions compel non-commercial speech.  *Because the provisions are content-based*, which the State does not contest, *they are subject to strict scrutiny*.") (emphases added).

But even assuming the relevant speech at issue in this analysis is that in which social media platforms typically engage, the Court rejects Weiser's sweeping claim that "the entire relationship between the regulated platforms and its user is commercial."  (*Id.* at 8.)  The nascent record[7] here demonstrates otherwise.  Specifically, NetChoice submits unrebutted declarations indicating that its members engage in content moderation.  (*See, e.g.*, ECF No. 15-3 at 6 ¶ 14 ("NetChoice members have chosen to balance disseminating large amounts of user-authored expression while also limiting publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities."); *see also* ECF No. 15-4 at 6 ¶ 18 ("Every family's relationship with media and technology is different.  Over the years, YouTube has built experiences that reflect not only this fact, but also the unique developmental differences between younger children and those in their teens.").

And the Supreme Court has made clear that content moderation is expressive

---

[7] Notably, while Weiser repeatedly stressed throughout his briefing and at oral argument that the record was too undeveloped for the Court's to grant the preliminary injunctive relief sought by Plaintiff, he also insists that the speech at issue here is commercial.  (*See* ECF No. 23 at 9 ("The required function is commercial speech . . . .").)  But if Weiser is correct that the record is sufficiently developed for the Court to adopt his position that the speech at issue is commercial—which is a fact-driven analysis, *First Resort, Inc.*, 860 F.3d at 1272—it is sufficient for the Court to adopt NetChoice's position that the speech is expressive.

speech in and of itself.  *See Moody*, 603 U.S. at 709–10 ("[T]he First Amendment offers

protection when an entity engaged in compiling and curating others' speech into an

expressive product of its own is directed to accommodate messages it would prefer to

exclude."); *see also id.* at 740 ("When the platforms use their Standards and Guidelines

to decide which third-party content those feeds will display, or how the display will be

ordered and organized, they are making expressive choices.  And because that is true,

they receive First Amendment protection."); *Packingham v. North Carolina*, 582 U.S. 98,

105 (2017) (social media allows people to "engage in a wide array of protected First

Amendment activity on topics 'as diverse as human thought'") (citation omitted).

It follows, then, that Weiser's suggestion that NetChoice's members necessarily

engage in commercial speech simply because third-party businesses advertise on their

platforms is unavailing.  (ECF No. 23 at 8–9.)  The Supreme Court has declined to

fashion a "sweeping definition[] of what constitutes commercial speech" because doing

so would effectively mean that "any speech can become commercial if eventually relied

on by third parties to purchase some good or service."  *Ketonatural Pet Foods, Inc. v.*

*Hill's Pet Nutrition, Inc.*, 756 F.Supp.3d 1128 (D. Kan. 2024) (citing *City of Cincinnati v.*

*Discovery Network, Inc.*, 507 U.S. 410, 419 (1993)).  "For example, under a broad

interpretation, a newspaper article could be considered 'commercial speech' because

the newspaper company sells newspapers, and a third party bases a decision on

information in the newspaper."  *Id.*; *see also New York Times Co. v. Sullivan*, 376 U.S.

254, 266 (1964) ("That the Times was paid for publishing [an] advertisement is as

immaterial in this connection as is the fact that newspapers and books are sold.").

Here, the primary difference between a social media platform's curated feed and

a newspaper's editorial page is that the former operates in the electronic sphere, whereas the latter has traditionally operated in the physical. *See Yost*, 778 F.Supp.3d at 948 (likening "social media operators" to "publishers of opinion work—a newspaper limited to 'Letters to the Editor,' or a publisher of a series of essays by different authors"). But that immaterial difference does not merit the adoption of a new, overly-capacious definition of commercial speech. *See Moody*, 603 U.S. at 719 (declaring that "the First Amendment . . . does not go on leave when social media are involved"). Like traditional media, a social media platform is entitled to heightened First Amendment protection where it is engaged in expressive activity. *Id.* "[E]xpressive activity includes presenting a curated compilation of speech originally created by others." *Id.*

In any event, the fact that there is arguably some commercial aspect to NetChoice's members' speech is not alone dispositive. Caselaw teaches that lower constitutional scrutiny may apply where a law specifically targets commercial speech, even if that commercial speech is accompanied by other expressive statements. *See, e.g., Wenger*, 427 F.3d at 854 (concluding that speech was commercial where statute regulated defendant's commercial statements, even though those statements were accompanied by expressive statements on the defendant's newsletter and syndicated radio program).

But here, Section 4 targets the impacts of social media use *generally*—that is, it does not *specifically* target the commercial speech that allegedly occurs on those websites by third-party advertisers. In the Court's view, this is yet another reason Section 4 is appropriately subject to strict scrutiny. *See In re Brunetti*, 877 F.3d 1330, 1349 (Fed. Cir. 2017) ("Section 2(a) regulates the expressive components of speech,

not the commercial components of speech, and as such it should be subject to strict scrutiny."); *see also NetChoice, LLC v. Yost*, 778 F.Supp.3d 923, 949 (S.D. Ohio 2025) (applying heightened scrutiny where the law's "provisions do not strike at the commercial aspect of the relationship between covered websites and their users, they tackle the social speech aspect of it").

The Court is not persuaded otherwise by *Free Speech Coal., Inc. v. Paxton*, on which Weiser relies. (ECF No. 23 at 9.) That case concerned a Texas statute requiring pornographic websites to, among other things, "display health warnings about the effects of the consumption of pornography" on the websites' landing page and on each subsequent page. *Id.* at 266. The Fifth Circuit concluded that this portion of the statute regulated commercial speech because, even assuming the websites may "offer educational speech[,] they only offer it as an add-on to their primary purpose"—offering porn in exchange for money. *Id.* at 280. In the Circuit's view, the websites' "landing pages are more like the entrance to a strip club—commercial activity with a speech element." *Id.* at 281.

But the landing pages on the pornographic websites are different than the feeds curated by the social media platforms at issue here. The *Free Speech Coal.* decision did not suggest that the pornographic websites moderated content or otherwise curated a bespoke feed based on the particular traits or viewing history of a given user. *See generally id.* By contrast, NetChoice's members allege—and substantiate via their unrebutted declarations—that they do just that. This difference is critical here because the Supreme Court has made clear that content moderation *is* expression. *Moody*, 603 U.S. at 709–10; *see also TikTok Inc. v. Garland*, 604 U.S. 56, 80 (2025) (Sotomayor, J.,

concurring) ("TikTok engages in expressive activity by 'compiling and curating' material on its platform."); *Ketonatural Pet Foods, Inc.*, 756 F.Supp.3d at 1146 ("The mere compilation of information is not commercial speech.").  Hence, unlike *Free Speech Coal.*, it cannot be said at this early stage of the litigation that the expressive aspect of NetChoice's members' platforms is a mere "add-on" to its primary, commercial purpose. *Id.* at 280.  If anything, the reverse appears likely to be the case.

Finally, given the Court's conclusion that the speech at issue here is likely not commercial, Weiser's reliance on *Zauderer* necessarily fails for purposes of the Motion. *See Recht v. Morrisey*, 32 F.4th 398, 416 (4th Cir. 2022) ("Here, the district court properly noted that *Zauderer* generally applies to the mandatory disclosure of commercial speech."); s*ee also Pharm. Rsch. & Manufacturers of Am. v. David*, 510 F.Supp.3d 891, 901 (E.D. Cal. 2021) ("If commercial speech is involved, then the *Zauderer* test applies.").  (*See* ECF No. 23 at 11 (recognizing that "[n]umerous courts . . . have applied *Zauderer to compelled commercial disclosures*") (emphasis added).)

In sum, the Court concludes that strict scrutiny likely applies to Section 4.

## D.  THE ACT LIKELY FAILS STRICT SCRUTINY

NetChoice contends that "[t]he Act's warning notification requirement fails strict scrutiny and any other form of heightened scrutiny."  (ECF No. 15 at 20.)  Weiser responds that "[t]he required 'function' satisfies *Zauderer*, or indeed any level of constitutional scrutiny."  (ECF No. 23 at 16.)  The Court agrees with NetChoice.

Strict scrutiny "is a demanding standard."  *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011).  "It is rare that a regulation restricting speech because of its content will ever be permissible."  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S.

803, 818 (2000); *see also Burson v. Freeman*, 504 U.S. 191, 211 (1992) ("[I]t is the rare

case in which we have held that a law survives strict scrutiny.").  A state must show that

the statute "furthers a compelling governmental interest and is narrowly tailored to that

end."  *Reed*, 576 U.S. at 171.  "If a less restrictive alternative would serve the

Government's purpose, the legislature must use that alternative."  *Playboy Ent. Grp.,

Inc.*, 529 U.S. at 813.

For the purposes of the Motion, the Court accepts Weiser's position that

Colorado has a compelling "interest in informing youth about the risks of excessive

social media use."  *See Sable Communications of California, Inc. v. F.C.C.*, 492 U.S.

115, 126 (1989) (explaining that "there is a compelling interest in protecting the physical

and psychological well-being of minors").  (ECF No. 23 at 20.)  Even so, the Court

concludes that NetChoice is likely to show that Section 4's compelled speech

requirement is not the least restrictive means available for advancing that compelling

interest.

The Court notes, for example, that instead of imposing the compelled speech

requirement, Colorado could have incentivized social media companies to voluntarily

provide these disclosures to their minor users, or it could have elected to provide minors

with these disclosures itself.  *See Bonta*, 113 F.4th at 1121 (striking down compelled

speech requirement where California "could have easily employed less restrictive

means to accomplish its protective goals, such as by (1) incentivizing companies to

offer voluntary content filters or application blockers, [or] (2) educating children and

parents on the importance of using such tools").  Notably, Colorado *did* elect to educate

minors about the impacts of social media use, as shown by the resource bank

established by the Act.  § 22-2-127.8(1)(a).  Thus, it is evident that Colorado had other options at its disposal for advancing its goal of protecting the health and well-being of its children from the potential adverse effects of social media use.

Resisting this conclusion, Weiser maintains that "exercising government speech or requiring classes in school are not substitutes for direct disclosures at the point of use."  (ECF No. 23 at 20.)  But this misstates the strict scrutiny standard.  The relevant constitutional inquiry is whether requiring social media companies to deliver Colorado's expressive message about the risks to minors of social media use is the least restrictive way of protecting minors from those alleged harms.  *Playboy Ent. Grp., Inc.*, 529 U.S. at 813.  As explained above, it clearly isn't.  *See Bonta*, 113 F.4th at 1121 ("[A] disclosure regime that requires the forced creation and disclosure of highly subjective opinions about content-related harms to children is unnecessary for fostering a proactive environment in which companies, the State, and the general public work to protect children's safety online.").

And even assuming that requiring social media companies to convey Colorado's expressive message is more effective than Colorado delivering that message to minors itself—which Weiser does not back with supporting argument or record evidence—the Court is not convinced that this theoretical difference is great enough to overcome the exacting strict scrutiny standard.  *See Brown*, 564 U.S. at 803 n.9 ("Even if the sale of violent video games to minors could be deterred further by increasing regulation, the government does not have a compelling interest in each marginal percentage point by which its goals are advanced.").

In all, the Court concludes that NetChoice is likely to show that Section 4's

unconstitutional applications "substantially outweigh" its constitutional ones.  *Moody*,

603 U.S. at 723.  As a result, NetChoice has demonstrated it is entitled to an order from

the Court preliminarily enjoining enforcement of the challenged provisions of the Act.

### III.     CONCLUSION

For the foregoing reasons, the Motion is GRANTED.  (ECF No. 15.)  Colorado is

hereby PRELIMINARILY ENJOINED from enforcing Section 4 of the Act until this matter

may be fully resolved on the merits of Plaintiff's claims.

Dated this 6th day of November, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge